UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____x
ALAN M. DRAKE,

             Plaintiff,

                                        **CIVIL CASE NO.:**   1:21-CV-0615 (DNH/DJS)

       -against-

                                          **EMPLOYMENT DISCRIMINATION
COMPLAINT PURSUANT TO 42 U.S.
CODE §§ 1981 & 1983,**

CITY OF AMSTERDAM POLICE DEPARTMENT,
GREGORY J. CULICK, JOHN THOMAS, THOMAS
HENNESSY, THOMAS NETHAWAY, LEON PRATT,
and AMSTERDAM POLICE BENEVOLENT
ASSOCIATION, INC.,

             Defendants.
_____x

     *Plaintiff demands a **JURY** trial*

Plaintiff in the above captioned action states and alleges against the defendants as follows:

<u>**JURISDICTION**</u>

     This is a civil action for employment discrimination based upon race, ethnicity, and/or skin color; seeking to defend and protect the rights guaranteed by the Constitution and Laws of the United States and the State of New York, and further seeking damages and other ancillary reliefs.

     This Court has jurisdiction over this action pursuant to: 42 U.S.C. §§ 1981, 1983, & 1985, 28 U.S.C. §§ 1331, 1343(3) & (4), & § 2201.

     The venue of this suit is proper pursuant to 28 U.S.C. § 1391.

## INTRODUCTION

Racial Discrimination by a municipality against a Black police officer who puts his life at risk day after day for the entire citizenry is particularly reprehensible because a Black police officer is generally confronted with grave distrust and nonacceptance by members of his own Black community as a result of his choice to wear the police (blue) uniform.  When this distrust by his own Black community – who for good reason have historically and unjustly suffered in the hands of police officers – is added to the dilemma of this Black police officer not being accepted by members of his own police department because of his race, this makes for an obnoxious and untenable cocktail in the minds of well thinking members of a civilized society.  Such is the condition that Alan M. Drake, the plaintiff in this action has been subjected to work under for over twelve years as a police officer in the employment of the City of Amsterdam Police Department.

## PARTIES

### PLAINTIFF

1. Plaintiff, Alan M. Drake (hereinafter "Drake or  plaintiff"), is a Black/African American male citizen of the United States.

2. Drake resides in the town of Guilderland, County of Albany, State of New York, which is within the territorial jurisdiction of this Court.

3. At all times herein relevant, Drake was an employee of defendant City of Amsterdam within the meaning of 42 U.S.C. § 2000e.

4. At all times herein relevant, Drake was a Black police officer employed by the City of Amsterdam.

<u>DEFENDANTS</u>

<u>City of Amsterdam</u>

5. The City of Amsterdam (hereinafter "City" or "APD") is a municipal corporation organized under the laws of the State of New York.

6. At all times herein relevant, the City Defendant was responsible for the appointment, training, supervision, discipline, retention, and conduct of all City employees.

7. At all times herein relevant, the City was responsible for the policy, practice, supervision, implementation and conduct of all City matters.

8. At all times herein relevant, the City was responsible for ensuring that City employees obey the laws of the United States and the laws of the State of New York.

9. At all times herein relevant, the City was Drake's employer within the meaning of 42 U.S.C. § 2000e.

10. At all times herein relevant, the City engaged in commerce within the meaning of 42 U.S.C. § 2000e.

11. At all times herein relevant, the City employed more than fifteen persons.

12. The City has its principal administrative office in the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

<u>Gregory J. Culick</u>

13. At all times herein relevant, Gregory J. Culick (hereinafter "Culick") was employed by, and acted as an agent of the City defendant.

14. At all times herein relevant, Culick's official address was within the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

15. At all times herein relevant, Culick was a White police officer employed by the APD.

16. At all times herein relevant, Culick was the Chief of Police for the City of Amsterdam.

17. At all times herein relevant, Culick acted under color of law based upon policy making authority delegated to him by the City of Amsterdam.

18. To the extent permitted by law, Culick is sued herein in his official capacity.

19. To the extent permitted by law, Culick is sued herein in his individual capacity.

<u>John Thomas</u>

20. At all times herein relevant, John Thomas (hereinafter "Thomas") was employed by, and acted as an agent of the City defendant.

21. At all times herein relevant, Thomas's official address was in the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

22. At all times herein relevant, Thomas was a White police officer employed by the City defendant.

23. At some times herein relevant, Thomas was a Sergeant, Deputy Chief of Police, or some other rank or designation at the City of Amsterdam Police Department.

24. At the present time and at other times herein relevant, Thomas was the Chief of Police, with policy making authority delegated to him the City of Amsterdam.

25. At all times herein relevant, Thomas acted under color of law, with the delegated authority of the City defendant.

26. At some times herein relevant, Thomas acted under color of law based upon policy making authority delegated to him by the City of Amsterdam.

27. To the extent permitted by law, Thomas is being sued herein in his official capacity.

28. To the extent permitted by law, Thomas is being sued herein in his individual capacity.

<u>Thomas Hennessy</u>

29. At all times herein relevant, Thomas Hennessy (hereinafter "Hennessy") was employed by, and acted as an agent of the City defendant.

30. At all times herein relevant, Hennessy was a White police officer employed by the APD.

31. At all times herein relevant, Hennessy's official address was in the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

32. At all times herein relevant, Hennessy was a Lieutenant or some other rank with the City of Amsterdam Police Department.

33. At all times herein relevant, Hennessy acted under color of law, with the delegated authority of the City defendant.

34. To the extent permitted by law, Hennessy is being sued herein in his official capacity.

35. To the extent permitted by law, Hennessy is being sued herein in his individual capacity.

<u>Thomas Nethaway</u>

36. At all times herein relevant, Thomas Nethaway (hereinafter "Nethaway") was employed by, and acted as an agent of the City defendant.

37.  At all times herein relevant, Nethaway's official address was in the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

38. At all times herein relevant, Nethaway was a White police officer employed by the APD.

39. At all times herein relevant, Nethaway was a Lieutenant or some other rank with the City of Amsterdam Police Department.

40. At all times herein relevant, Nethaway acted under color of law, with the delegated authority of the City defendant.

41. To the extent permitted by law, Nethaway is being sued herein in his official capacity.

42. To the extent permitted by law, Nethaway is being sued herein in his individual capacity.

<u>Leon Pratt</u>

43. At all times herein relevant, Leon Pratt (hereinafter "Pratt") was employed by, and acted as an agent of the City defendant.

44. At some times herein relevant, Pratt was the President of the Amsterdam Police Benevolence Association Inc.

45. At all times herein relevant, Pratt's official address was in the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

46. At all times herein relevant, Pratt was a White police officer employed by the APD.

47. At some times herein relevant, Pratt was a Detective, Lieutenant, or some other rank with the City of Amsterdam Police Department.

48. At all times herein relevant, Pratt acted under color of law, with the delegated authority of the City defendant.

49. At all relevant times herein, Pratt was vested with the delegated authority to act as the President and decision making official on behalf of the Amsterdam Police Benevolent Association, Inc.

50. To the extent permitted by law, Pratt is being sued herein in his official capacity.

51. To the extent permitted by law, Pratt is being sued herein in his individual capacity.

<u>Amsterdam Police Benevolent Association, Inc.</u>

52. Amsterdam Police Benevolent Association, Inc. (hereinafter "PBA"), is a not-for-profit corporation organized under the laws of the State of New York.

53. At all times herein relevant, the PBA was responsible for the appointment, training, supervision, discipline, retention, and conduct of all of its employees.

54. At all times herein relevant, the PBA was an employer, employment agency, or labor organization within the meaning of 42 U.S.C. § 2000e.

55. At all times herein relevant, Drake was a paying member of the PBA entitling him to all of the rights and privileges of membership enjoyed by other similarly situated White police officers.

56. At all times herein relevant, the PBA was an employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the

purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment.

57. At all times herein relevant, the PBA was engaged in commerce within the meaning of 42 U.S.C. § 2000e.

58. At all times herein relevant, the PBA had more than fifteen members.

59. At all times herein relevant, the PBA was a local labor organization recognized or acting as the representative of employees of an employer engaged in an industry affecting commerce.

60. At all times herein relevant, the PBA was responsible for the policy, practice, supervision, implementation and conduct of all PBA matters.

61. At all times herein relevant, the PBA was responsible for ensuring that PBA employees obey the constitution and laws of the United States and the State of New York.

62. The PBA has its principal administrative office within the City of Amsterdam, County of Montgomery, State of New York, which is within the territorial jurisdiction of this Court.

**FACTUAL ALLEGATION**

RELEVANT BACKGROUND

63. On or about January 5, 2009, Drake was hired as a police officer by the City of Amsterdam Police Department.

64. At the time of Drake's hire, an employment discrimination lawsuit was pending in this Court against the City of Amsterdam.

65. The then pending lawsuit was filed by a member of a racial minority against the City of Amsterdam for, among others, sex and racial discrimination in employment. See, *Kercado-Clymer v. City of Amsterdam et al, Case 6:07-cv-00086-CBK*.

66. At the time of hire and at various times during the course of Drake's employment, Pratt (who was the PBA President at the time), and other White police officers would tell Drake on a

number of occasions that the only reason he was hired was because of the pending racial discrimination employment lawsuit against the City, and that Drake (who is Black), was being brought in as "a show piece."

67. Furthermore, during Drake's training, unlike all the other White police officers in training, Drake was not allowed to drive a police vehicle during training.

68. All the other White police officers who went through training before and after Drake were all allowed to drive the police vehicle during training.

69. Also, unlike the other White police officers, Drake was not properly trained by Nethaway - his training officer. The extent of this inadequate training was such that Drake was never taught how to do a basic complaint and was instead thrown out to work nights. As a result of this lack of training, the other White police officers would speak very poorly and negatively of Drake behind his back. These White police officers would call Drake "stupid" and "not smart."

70. APD former Chief of Police Brownell told Drake that: "as officers we all have targets on our backs but your target is bigger than everyone else's because you are a Black officer," or words to that effect.

71. Brownell and many other Sergeant's at APD conspicuously and proudly displayed White supremacist symbols like the confederate flags and other White supremacist symbols at the City of Amsterdam police station and on their persons and key chains.

72. On one occasion, Sergeant DeCaprio threatened to write up Drake for wearing a Columbia brand charcoal gray winter boots, because, according to Sergeant DeCaprio, "this is not the hood," or words to that effect. DeCaprio also said to Drake angrily that Drake's boots was a big topic of discussion at administrative staff meetings upstairs.

73. Drake was highly offended by DeCaprio statements, and understood DeCaprio's statement to be racially discriminatory and offensive.

74. Additionally, Drake was being constantly harassed by Pratt in various other ways and believed that Pratt constantly harassed him because of Drake's race as a Black police officer.

75. On or about December 3, 2013, Drake had a meeting with Sgt. Cole and Sgt. Rust so as to report the constant harassment that he was receiving from Pratt.

76. Chief of Police Culick had set up the meeting and was supposed to be in attendance. Nonetheless, Culick did not show up for the meeting.

77. In 2014, Drake requested a meeting with former Mayor Thane to complain about the racially hostile work environment at APD.

78. Mayor Thane was so apprehensive of a backlash from APD if she was seen talking to Drake that she requested that the meeting between her and Drake take place outside of the city of Amsterdam.

79. After Drake narrated his ordeal to Mayor Thane at the meeting, Mayor Thane advised Drake to leave the City of Amsterdam and that she would write a good letter of recommendation on Drake's behalf. She however failed to take any action to address the racially hostile work environment.

<u>CONTINUING VIOLATION</u>

80. Throughout the course of Drake's employment at APD, he was widely addressed and referred to as "hot chocolate" by the other White officers and employees of APD.

81. Pratt, who occupied supervisory authority over Drake as both a senior police officer and the PBA president, conspicuously and proudly carried and displayed a large *SS Bolt* tattoo on his left wrist.

82. The *SS Bolt* symbol is a common white supremacist/Neo-Nazi symbol derived from Schutzstaffel (SS) of Nazi Germany. The SS, led by Heinrich Himmler, maintained the police state of Nazi Germany. Its members ranged from agents of the Gestapo to soldiers of the

Waffen (armed) SS to guards at concentration and death camps, (see: https://www.adl.org/education/references/hate-symbols/ss-bolts).

83. Drake, found this tattoo to be highly offensive to him as a Black police officer, and felt that he was forced to work under the authority of Pratt who displayed a hate symbol against Drake as a result Drake's race. Drake found this work environment to be a racially hostile work environment.

84. Drake complained to Culick and other higher ranking police officers several times about the openly racist environment that he had to work under.

85. Even though Pratt's racist tattoo was against the City's own written non-discrimination policy, Culick took no action to address the racially hostile environment.

86. To date, the work environment at APB is so severely permeated by racial prejudice and intimidation to such an extent that senior officers of the APD perpetuate and promote racial stereotypes and a racially hostile work environment against Black persons because of the color of the person's skin.

87. As an example, attached herewith and made a part hereof as **"Exhibit 1",** is a social media posting and pictures posted by Sergeant Rob Caputo, a senior police officer at APD, posted as recently as April 20, 2021, denigrating and demonizing George Floyd, Breonna Taylor and other Black persons who have been recently killed by police officers in the United States.

88. Caputo's social media depictions (Exhibit 1) are all based upon demonstrably false premises, and are unbecoming of a senior police officer who has sworn to protect and serve all persons (including Black persons), and who should know better.

89. This social media post (Exhibit 1) was available to Drake because he is connected to Caputo on the social media platform in question.

90. Drake found these social media depictions (Exhibit 1) to be opprobrious and highly offensive to

him as a Black person, who happens to be a police officer working under Caputo, who is a Sergeant in his police department.

91. In addition, numerous White police officers at APD have repeatedly made racially charged and insensitive comments against Drake.

92. For example, the White police officers at APD have a standing "internal joke" to the effect that, "if anything goes wrong, it's Drake's fault," or words to that effect.

93. Additionally, throughout the course of Drake's employment with APD, up until the present, unlike other similarly situated White police officers who received seniority, once Drake received seniority over other White police officers, APD would rescind the benefit or privilege customarily attached to that particular seniority entitlement so that Drake would not enjoy such benefit or privilege of employment over the White police officers. APD widely referred to this practice as the unwritten "Drake rule."

94. Some of the examples of this unwritten "Drake rule" includes:" throughout the course of Drake's employment with APD up until the present, unlike other White police officers in Drake's position, APD would not allow new junior police officers to ride with Drake even though Drake is the senior police officer on the shift. Also, unlike other White police officers, APD would not allow Drake to work the afternoon desk. Furthermore, unlike other White police officers, Drake has never been asked to do special details for the community. Additionally, throughout the course of Drake's employment, unlike other White police officers, APD Detective Bureau refuses to utilize Drake's services, and would instead utilize the services of unqualified White junior police officers.

95. APD would also change other rules, and take away other benefits and privileges of employment that would otherwise benefit Drake whenever he attained seniority over junior White police officers. In January 2016 APD changed the rule that 7:00 car cannot have the desk during the

second half. This rule change started once Drake was assigned to that shift and had seniority. The January 2016 rule change went with Drake in whatever shift Drake was assigned to, and was also commonly known as part of the "Drake Rule".

96. Throughout the course of his employment, Drake reported these disparate treatments to APD management and senior officials.

97. APD management and senior officials failed to take any action to address the disparate treatment.

98. Throughout the course of his employment, Drake reported these disparate treatments to three successive PBA union presidents.

99. The union presidents failed to take any action to address the disparate treatment.

100.    Throughout the course of Drake's employment, unlike other White police officers, Drake has been repeatedly passed over for training opportunities. Instead of providing training to Drake, APD would provide training to junior White police officers.

101.    These disparate treatments and lack of training has affected the terms and conditions of Drake's employment, in that; it has prevented Drake from taking advantage of promotional opportunities that he would otherwise have been qualified for had he not been treated differently when compared to other White police officers and also passed over for training opportunities.

102.    Furthermore, APD's denial of these earned seniority benefits and privileges of employment to Drake is not mere inconveniences, but rather significant, because, granting Drake these earned benefits and privileges, and the opportunity to perform in those earned capacities would afford Drake a chance to prove that he can be trusted to perform executive and supervisory tasks over junior police officers and would enhance Drake's resume and work experiences, resulting in being considered for promotional opportunities as a police officer.

103.     Also, another example of this disparate treatment is that; as previously noted, Pratt conspicuously displayed a White supremacist tattoo.  However, when Drake got a benign tattoo, APD changed the rules applicable to tattoos, and instituted a no-tattoo policy.  Following the institution of the no-tattoo policy, the other White police officers would frequently blame Drake that it was Drake's fault that APD started preventing them from getting a tattoo.

104.     Drake founds these disparate treatments and comments to be highly offensive, and targeted against him because of his race.

105.     Furthermore, unlike other similarly situated White police officers, Drake has been severally written up for spurious and unwarranted reasons.

106.     In fact, from the period September 16, 2020 through October 1, 2020, APD issued at least three bogus, spurious, and unwarranted counseling and poor performance evaluation against Drake.  This was shortly after Thomas took over as Chief of Police and Drake had reported APD's racial discrimination against him to Mayor Cinquanti.

107.     For example, on or about October 1, 2020, APD issued a "Poor Work Performance" evaluation against Drake and wrote him up for not issuing enough traffic tickets between July 2020 through September 2020.

108.     APD issued a "Poor Work Performance" evaluation against Drake and wrote him up for not issuing enough traffic tickets, even though APD's own written policy states "[t]his department does not establish ticket quotas.  The number of arrests or tickets issued by any member shall not be used as the sole criterion for evaluating member overall performance."

<u>NOVEMBER 2017 UNPAID SUSPENSION</u>

109.     On or about November 6, 2017,  Culick, Thomas, Nethaway, and Pratt, among others; without due process and without any meaningful union or legal representation; threatened, coerced, and forced Drake to sign a Last Chance Agreement (LCA) based upon charges

trumped-up against Drake.

110.     The LCA resulted in a forty five days suspension without pay against Drake, a forfeiture of 360 hours of his accrued paid leave time, and a requirement that Drake submit to EAP psychological counseling services with proof of compliance and progress submitted to the City.

111.     Contrary to the constitutionally required due process protections of the parties Collective Bargaining Agreement (CBA) and the *N.Y. Civ. Serv. Law § 75* which provides that: "[a]n employee who at the time of questioning appears to be a potential subject of disciplinary action shall have a right to representation by his or her certified or recognized employee organization under article fourteen of this chapter and shall be notified in advance, in writing, of such right," the defendants did not provide Drake any with any such written notice, and no such written notice exists to this day.

112.     Additionally, the defendants did not so much as provide Drake with any written notice of disciplinary charges, nor did they they provide any written document nor evidence underlying the trumped-up charges against Drake.

113.     Instead, the defendants threatened that if Drake insisted on seeing any written charge nor any written document or evidence underlying the the trumped-up charges against him, then the deal of not terminating him was off, and defendants would forthwith terminate from his career as a police officer

114.     In support of this unjust and unwarranted assassination of Drake's career as Black police officer, contrary to the provisions of the parties CBA, the defendants (including Pratt – the union President), falsely advised Drake that APD was completely and exclusively in charge of picking the arbitrator that will hear and decide the merits of the trumped-up charges against Drake.

115.     Also, during the supposed negotiation of the LCA, the defendants, kept threatening Drake that both the city attorney and the District attorney were aware of the allegations against Drake and that APD will get these individuals to file criminal charges against Drake unless Drake signed the LCA.   Drake now believes this representation to be false based upon subsequent information received by Drake after the signing of the LCA.

116.     Based upon these false information and misrepresentations provided by the defendants to Drake, including the false representation that  APD was completely and exclusively in charge of picking the arbitrator that will hear and decide the merits of the trumped-up charges against Drake, Drake felt he had no chance of overcoming the trumped-up charges against him, and that he had no choice but to sign the LCA or otherwise his employment and career will be terminated.

117.     Pratt and the PBA, instead of defending Drake as they routinely do when similarly situated White police officers are subjects of disciplinary action, parroted, echoed, and joined with the other APD defendants in carrying out the same false allegations and threats against Drake.

118.     For example, in contrast to other similarly situated White police officers who are subjects of discipline, prior to entering into a Settlement Agreement with APD, Pratt and the PBA would insist that APD disclose the information and evidence underlying the charges or allegations against the White police officer in question.

119.     In fact, based upon documents provided by APD, in almost all of the cases involving similarly situated White police officers who were subjects of discipline, APD would first serve a written notice of discipline upon the White police officers and upon the PBA, and also provide the underlying information and evidence prior to reaching a settlement on the charges.

120.     As a result of the lack of any forthcoming information from the defendants; coupled

with the lack of any written notice and the absence of representation from the PBA, Drake was left with no choice but to attempt to procure the services of a private attorney on very short notice.  Drake could not have any meaningful consultation with this private attorney[1], because the retention was on such a short notice.  Furthermore, because that attorney had a conflicting schedule during the discussion that resulted in the signing of the LCA, he appeared over the telephone while driving to another appointment.

121.    As proof of this lack of representation by the PBA in connection with the November 2017  LCA, a copy of the LCA provided to Drake only has his signature, and does not contain any signature of the PBA president nor any union attorney representing  Drake.

122.    In contrast, a review of similarly situated settlement agreement involving White police officers, all contain the signatures of the PBA union president as a representative of the White police officer in question.

123.    Also, based upon information provided by APD, Drake is the only police officer who has ever been made to sign an LCA in the memory of the department.  No White police officer has ever been made to sign an LCA even though many White police officers have been charged with worst charges than those alleged against Drake.

124.    Based upon all of the information provided in the foregoing paragraphs and in the paragraphs to follow, Drake reasonably believes that defendants have all collectively treated him differently in a significantly negative way because of his race.

125.    The copy of the LCA that Drake has always had is blank where the signature for an "Attorney for the employee" is supposed to be.

126.    Just recently, in or about January 2021, APD for the first time provided to Drake, a purported  copy  of  an  LCA  with  an  unclear  and  illegible  signature  set  forth  on  the  column

---

1  Not your  undersigned present counsel for Drake

reserved for the "Attorney for the employee."    The purported signature is on a page different from the pages where Drake and  APD signed.  The inscription "Attorney for the employee" appears to be crossed out with the stroke of a pen.  The purported signature is so unclear and illegible that it is hard to say whose signature it is.

127.    Contrary to the constitution and laws of the United States and the State of New York, Drake submits that defendants denied him his due process rights in connection with the LCA.

128.    Additionally, during the NYSDHR investigation of this case, APD, for the first time provided to Drake the purported Notice of Charges dated November 2, 2017, purportedly underlying the LCA.

129.    The November 2, 2017 purported notice of charges provided by the defendants has the words: "CHARGES NOT FILED/SETTLEMENT REACHED"  boldly handwritten on it.

130.    Upon review of the Notice of Charges dated November 2, 2017, it becomes readily apparent that the defendants had tricked Drake into signing an LCA based upon factual allegations that were not only patently false, but that the statute of limitation on the charges had also run out.

131.    Additionally, even though largely false, just about all of the charges on the purported notice of charges centered on Drake having sex with White ladies who reside in the City of Amsterdam and does not have much to do with Drake's job performance as a police officer.

132.    Following the signing of the LCA, Nethaway and Pratt (PBA) said to Drake "stay out of the City," or words to that effect.

133.    As to the requirement that Drake submit to EAP psychological counseling services, the psychologist that Drake was referred to by APD, met with Drake for a few minutes once, and determined that Drake did not have any problem requiring psychological counseling.

134.    Upon information and belief formed after a review of documents provided by the City

and based upon Drake's observation, no White police officer in the City of Amsterdam has ever been made to sign a last chance agreement regardless of the severity of the offense charged against any such White police officer.

135.    Upon information and belief formed after a review of documents provided by the City and based upon Drake's observation, no White police officer in the City of Amsterdam has ever been made to sign a settlement agreement without first being issued a notice of discipline and given ample opportunity to review the same with the PBA and the person's attorney.

136.    Upon information and belief formed based upon Drake's observation of events and after a review documents provided by APD, sometime in 2017 and at other times, defendant Thomas Hennessy, a White police officer was caught having ongoing extra-marital sexual relations with another City employee while on duty.  APD did not make Hennessy sign a last chance agreement.  In fact, sometime after this discovery, Hennessy was promoted to the rank of a Lieutenant.

137.    Upon information and belief formed after a review of documents provided by the City and based upon Drake's observation, in August, 2019, the City reached a settlement agreement which only took away remaining unspecified time in a White police officer's time bank – excluding sick time; in a case involving a White police officer who sent a set of photographs depicting himself partially nude along with various texts from the White police officer to another party describing an extra marital affair.  These photographs and text messages were widely publicized on various social media sites.  In one of the text messages, the White police officer stated: "Maybe we can jump the fence at the middle school football field one night and have sex under the stars on the 50 yard line."

138.    Based upon all of the circumstances surrounding the purported execution of the November 2017 LCA, including but not limited to: the fraudulent inducement, the denial of due

process, the absence of legal representation from the PBA, the disparate treatment; Drake respectfully submits that November 2017 purported LCA is legally invalid, void, unenforceable, and should be declared as such.

<u>DECEMBER 2020 SUSPENSION AND APRIL 2021 TERMINATION</u>

139.    On or about June 3, 2020, on behalf of Drake, his wife Jennifer[2] sent a detailed email to the newly elected Mayor Cinquanti reporting what they believe to be "systemic racism" by "the City of Amsterdam" against Drake.

140.    On or about  June 5, 2020,  Mayor Cinquanti appointed Thomas to be the Chief of Police.

141.    On or about  June 10, 2020, Mayor Cinquanti responded to the Drakes' email essentially denying that racial discrimination exists at APD, effectively shutting down the report without any investigation.

142.    To the chagrin of the Drakes, Mayor Cinquanti further recommended that Drake speak to Thomas concerning this report of racial discrimination – when in fact Thomas was the protagonist of the racial discrimination against Drake.

143.    Immediately upon taking office as Chief of Police, Thomas started the same intimidating and threatening tactics he had previously utilized against Drake – which left Drake with no choice but to to sign the November 2017 LCA.

144.    In the same month of June, after Thomas became Chief of Police, Thomas immediately started threatening to take away five days of pay from Drake for *de minimis* matters that had already been addressed under the previous Chief of Police Culick.

145.    After Drake refused to succumb to the threats and give up five days of pay for the *de minimis* matters that had already been handled under the previous Chief of Police Culick,

_____

2   Drake's wife Jennifer is White

Thomas progressively continued to escalate his threats to the point of making it clear to Drake that he (Thomas) wants Drake gone from APD.

146.     From in or about September 2020, Thomas would have messages sent to Drake letting Drake know that Drake is not wanted in the City's police department, and that Drake should either resign or Thomas would proceed to terminate Drake's employment based upon the clause of the purported LCA which provides that, should "a jointly selected fair and impartial final and binding arbitrator determine that Alan M. Drake is guilty of ANY major and intentional violation of the Amsterdam Police Department Rules and Regulations or Policies and Procedures, said determination will result in your immediate dismissal from duty."

147.     On or about December 23, 2020, Thomas seemingly seeing his opportunity to terminate Drake's employment, suspended Drake without pay and issued a notice of discipline against Drake because Drake allegedly took about thirty minutes to respond to a non emergency call in September 2020.

148.     On or about December 23, 2020, Thomas issued a notice of discipline against Drake for allegedly taking approximately thirty minutes to respond to the non emergency call.  The notice of disciplined contained three other *de minimis* charges which were later dismissed.  The notice of discipline also sought the termination of Drake's employment.

149.     On April 26, 2021, after a disciplinary hearing before an arbitrator, APD terminated Drake's employment solely on the basis that it took Drake approximately thirty minutes to respond to the non emergency call for the first and only time that Drake was even accused of such.

150.     During the disciplinary proceeding, upon information and belief formed based upon information provided by Drake's witnesses, in contrast to APD witnesses being paid for the time spent testifying for APD during the hearing,  APD refused to pay the few courageous officers

who testified on Drake's behalf for the time they spent testifying on Drake's behalf.

151.　　This disparate treatment of Drake's witnesses and the City's witnesses had a chilling effect on witnesses and potential witnesses for Drake, thereby prejudicing Drake during the arbitration hearing.

152.　　This non-emergency dispatch leading to Drake's termination and an end to his police career occurred on or about September 3, 2020. It involved a mother and daughter arguing over which one of them owns a duffel bag, and each of them wanting the other to be arrested. This particular mother and daughter was widely known to officers of APD for incessantly calling the police against each other over civil disputes involving ownership of trivial properties. In fact, the dispatcher who had sent this call to Drake advised Drake to take his time in getting to the call.

153.　　Given the known history of this mother and daughter, and the eventual outcome of the call – which was (one again) a directive given to the mother and daughter by Drake and the other White police officer who responded to the call, that their dispute was once again a civil matter to be handled in a small claims court and not a matter for the police –  the approximately thirty minutes it took Drake to respond to the call was reasonable under the circumstances.

154.　　Furthermore, this was the first and only time that Drake had been accused of delaying in responding to a dispatch call.

155.　　Upon information and belief formed based upon Drake's observation of events and upon a review of documents provided by the City, no White police officers has ever been issued a notice of discipline for delaying in responding to any call – not to mention – terminated for delaying to respond to a non-emergency call.

156.　　 Upon information and belief formed based upon Drake's observation of events and upon a review of documents provided by the City, Drake knows so many White police officers who

have delayed significantly in responding to calls they are dispatched to.  There has even been occasions where the dispatcher could not locate nor reach officers for hours wile on duty, including: Tommy D, Gifford, Hennessy (all White police officers).

157.     Upon information and belief formed based upon Drake's observation of events and upon a review of documents provided by the APD, APD never issued a notice of discipline against these White police officers for not being reachable while on duty and for delaying in responding to any call.

158.     Furthermore, several White police officers have been accused of committing substantially more serious misconduct and incompetence than that alleged against Drake, and yet have received significantly less lenient penalty than the extreme penalty imposed upon Drake.

159.     Upon information and belief formed based upon a review of documents provided by APD, on or about July 31, 2013, defendants reached a settlement agreement dismissing charges against a White police officer who "received a subpoena from the Montgomery County District Attorney's Office directing [him] to appear in Montgomery County Grand Jury,"  was  "verbally reminded of the hearing 2 days prior," but "failed to appear at Montgomery County Grand Jury,[3]" and made no notification to the Court indicating that [he] would not appear on that date nor did [he] request a postponement of the appearance."   "Despite prior counseling," this particular White police officer only received the punishment of loss of "32 hours of time from [his] Holiday bank."

160.     In contrast with Drake's situation, defendants suspended Drake without pay for thirty days and then proceeded to terminate Drake's employment and end his career as a police officer because it allegedly took Drake thirty minutes to respond to a non-emergency call for the first

---

3   As noted by the City in its Notice of Discipline, this White police officer's "failure to report as summoned could be handled as a criminal matter."   Nonetheless, the defendants did not proceed as such.

time under extenuating circumstances.

161.     Upon information and belief formed based upon a review of documents provided by APD, on or about July 4, 2013, defendants reached a settlement agreement dismissing disciplinary charges against a White police officer who was "scheduled to work at 6am," "did not arrive to work until after 8am."  At the time the notice of discipline for this charge was issued, this particular White police officer  had "a pending discipline for not showing up as required for duty just 2 months prior to this event," but only received the punishment of loss of "3 hours of time from [his] Holiday bank."

162.     Upon information and belief formed based upon Drake's observation of events and upon a review of documents provided by APD, on or about August 27, 2020, defendants reached a settlement dismissing charges against a White police officer who blatantly and intentionally refused to abide by lawful orders of his superior officers in connection with a domestic violence case.    This particular White police officer only received a one day suspension from the defendants.

163.     Upon information and belief formed based upon Drake's observation of events and upon a review of documents provided by APD, on or about February 13 2019,  defendants reached a settlement dismissing charges against a White police officer who is believed to have been involved in misconduct and incompetence significantly more serious than that alleged against Drake.  In the case of this White police officer, the defendants retroactively issued a "voluntary unpaid suspension commencing on January 22, 2019 and  terminating on February 13, 2019," along with a forfeiture of unspecified days of "vacation, holiday, sick, and personal time accrued to his credit as of the date of execution of this agreement" and retention of "his accrued compensatory time, if any, for his future use or cash payment particular."    No formal disciplinary charges was filed against this White police officer.

164.     Upon information and belief formed based upon a review of documents provided by APD, on or about November 11, 2013, defendants placed a White police officer who was the "subject of a criminal investigation," "on <u>paid</u> suspension from duty for a period not to exceed 30 days."

165.     In contrast to Drake, defendants suspended Drake without pay "until the disposition of [his] pending disciplinary matter."  Drake faced no criminal charges but instead faced rather trumped-up and hyperbolic charges – of which three of the charges were found to be without merit.

166.     It is axiomatic that two separate disciplinary standards exists within the City of Amsterdam Police Department.  The first standard is the extremely harsh and unrealistic standard applied to Drake as a Black police officer, and the second standard is the extremely lenient and tolerating standard applied to White police officers.

167.     Drake was and still remains eminently and distinctly qualified to be a police officer without being suspended nor terminated from his employment.

168.     Drake reasonably believes that his suspension and the eventual termination of his employment by APD was done in whole or in part because of his race.

169.     Additionally, given the temporal proximity between Drakes' email correspondences with Mayor Cinquanti from June 3, 2020 through June 10, 2020, in which he reported the racial discrimination against him at APD,  and the adverse employment actions that ensued against him, Drake reasonably believes that the December 2020 suspension without pay and the April 2021 termination of his employment was done in retaliation because he opposed the racial discrimination at APD.

170.     The adverse employment actions immediately followed in June; beginning with APD threatening to take away five days of pay from Drake, to APD making it clear to Drake that

APD does not want  him, to the suspension of Drake in December 2020, and then culminated in APD terminating Drake's employment in April 2021.

171.    Drake reasonably believes that his suspension and the eventual termination of his employment by APD was done in whole or in part because he engaged in the protected activity of reporting racial discrimination to Mayor Cinquanti.

172.    Furthermore, there is a nexus between the kind of threats and intimidation utilized by APD in procuring the November 2017 LCA and in the recent suspension and termination of Drake.

173.    As such the continuing violation doctrine should be applied to the unpaid suspension in November 2017 and the unpaid suspension and eventual termination in 2021.

174.    As previously noted, from the beginning of Drake's employment at APD, right up until the present as evidenced by the social media posting of Sergeant Rob Caputo in April 2021, APD has allowed and promoted a work environment permeated with racial discrimination and racial bigotry against members of the Black race, including their own fellow police officer who happens to be Black.

175.    As previously fully set forth in preceding paragraphs, no White police officer at APD has ever been the subject of discipline for taking thirty minutes to respond to a non-emergency call – even though many of the White police officers have taken significantly longer time to respond to non-emergency calls.  Yet, Drake's employment and career as a police officer, was ended for just that reason..

176.    The Mayor, the Chief of Police, and all of the responsible management officials have failed to take any action to remedy the racially hostile work environment even after repeated complaints filed by Drake.

**CAUSATION AND DAMAGES**

177.    As a direct and proximate result of the actions of these defendants, Drake has suffered

immense injuries and damages, including, but not limited to: lost wages from past, present, and

future employment, loss of fringe benefits, an end to a career that he loves, and Attorney's fees.

178.    Defendants' unlawful actions or inaction has inflicted severe physical, mental and

emotional anguish, trauma, distress, fear, embarrassment, humiliation, frustration, anxiety,

extreme inconvenience, and other pains and sufferings upon Drake.

179.    Drake has suffered severe consequential financial loss as a result of the unlawful actions

or inaction of the defendants.

180.    The actions and/or inaction of the individual defendants as described above were

extreme, outrageous, and a shock to the conscience of a reasonable person, as such an award of

exemplary and punitive damages is appropriate.

**CAUSES OF ACTION**

FIRST CAUSE OF ACTION
RACE DISCRIMINATION UNDER 42 U.S.C. § 1981
(AGAINST ALL THE DEFENDANTS)

181.    Drake reasserts and restates all of the allegations set forth in paragraphs 1 through 180

as if the same is more fully set forth herein.

182.    Pursuant to 42 U.S.C. § 1981, it is unlawful for an employer to discriminate against any

person because of such person's race or the color of the person's skin.

183.    Drake is eminently qualified to remain at his job without being suspended nor

terminated from his employment, and without ending his career as a police officer.

184.    Defendants admit that no other police officer at APD has ever been made to sign a Last

Chance Agreement.

185.    Defendants discriminated against Drake because of his race with respect to the Last

Chance Agreement.

186.    A Last Chance Agreement by definition means that the signor had previously been the subject of more than one disciplinary action and is now being given the last chance to correct course or be terminated.

187.    Drake had never been the subject of any disciplinary action, nor had a notice of discipline being issued against Drake prior to being made to sign the Last Chance agreement under the circumstances described in this complaint.

188.    The November 2017 LCA suspended Drake for more than forty five days without pay, and further took away 360 hours of pay from Drake's time bank.

189.    APD further suspended Drake without pay in December 2020, and proceeded to terminate his employment and end his career as a police officer in April 2021.

190.    Given all of the circumstances described in this complaint, Drake reasonably believes that the November 2017 LCA which suspended Drake for more than forty five days without pay, and further took away 360 hours of pay from Drake's time bank was done in whole or in part because his race.

191.    Given all of the circumstances described in this complaint, Drake reasonably believes that the December 2020 suspension without pay and the April 2021 termination of his employment  was done in whole or in part because his race.

192.    The adverse employment actions carried out by the defendants against Drake was more than just a mere inconvenience.

193.    By discriminating against Drake on the basis of his race, defendants engaged in a continuing pattern and practice of illegal discrimination in violation of 42 U.S.C. § 1981.

194.    Accordingly, defendants are jointly and severally liable to Drake in an amount to be determined at trial.

SECOND CAUSE OF ACTION
HOSTILE WORK ENVIRONMENT UNDER 42 U.S.C. § 1981
(AGAINST ALL THE DEFENDANTS)

195.    Drake reasserts and restates all of the allegations set forth in paragraphs 1 through 194 as if the same is more fully set forth herein.

196.    Pursuant to 42 U.S.C. § 1981, it is unlawful to subject a person to a hostile work environment on the basis of the persons race.

197.    As set forth above, defendants engaged in a continuing pattern and practice of subjecting Drake to a hostile work environment because of his race.

198.    Drake was made to work under the supervision of a PBA President (Pratt) who proudly and conspicuously carried a hate symbol as a tattoo.

199.    Among other instances as previously noted, APD stereotyped Drake as: "not smart," "this is not the hood," "if anything goes wrong it's Drake's fault," you are only hired as a show piece because you are Black,"and many other words to that effect.

200.    As evidenced by APD senior police officer social media posting, this racially intimidating and offensive work environment still exists at APD to date. This recent social media posting by APD senior police officer is based upon demonstrable false stereotypes attached to Black persons.

201.    The hostile work environment was sufficiently severe and pervasive to such an extent as to alter the terms and conditions of Drake' employment.

202.    APD management officials have failed to correct the hostile work environment and have in fact continued the same.

203.    For all of the foregoing reasons, defendants are jointly and severally liable to Drake in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
## RETALIATION UNDER 42 U.S.C. § 1981
## (AGAINST ALL THE DEFENDANTS)

204.    Drake reasserts and restates all of the allegations set forth in paragraphs 1 through 203 as if the same is more fully set forth herein.

205.    Pursuant to 42 U.S.C. § 1981, it is unlawful to retaliate against an individual for opposing unlawful employment discrimination.

206.    Defendants engaged in a continuing pattern and practice of retaliation against Drake and failed to take any remedial action with respect to Drake's complaints to management officials and to two different Mayors regarding unlawful discrimination.

207.    At various times during his employment, Drake made complaints in good faith to management officials and the Mayors regarding unlawful discrimination at the workplace.

208.    By protesting the unlawful discrimination practices, Drake engaged in a protected activity.

209.    As a result of Drake's engagement in a protected activity, defendants took adverse employment actions against Drake by threatening him, writing him up, suspending him without pay, and eventually terminating his employment.

210.    A reasonable employee, such as Drake would find the actions of the defendants to be materially adverse and dissuading from engagement in a protected activity.

211.    Defendants' adverse actions have dissuaded, and has the potential of dissuading a reasonable employee from opposing unlawful employment discrimination.

212.    There is a causal connection between the adverse employment actions and Drake's protected activity.

213.    For all of the foregoing reasons, defendants are jointly and severally liable to Drake in an amount to be determined at trial.

FOURTH CAUSE OF ACTION
42 U.S.C. § 1983 DEPRIVATION OF DRAKE'S
FOURTEENTH AMENDMENT EQUAL PROTECTION RIGHTS
(AGAINST ALL THE DEFENDANTS)

214.     Plaintiff restates and reasserts all of the allegations set forth in paragraphs 1 through 213

as if the same is more fully set forth herein.

215.     Class of One:  Defendants intentionally discriminated against Drake on the basis of his

race.

216.     Selective Enforcement:  As set forth in the preceding paragraphs, defendants unlawfully

perpetrated and perpetuated adverse employment actions against Drake when compared to other

similarly situated White police officers.

217.     There was no legitimate nor rational basis for the disparate treatment against Drake.

218.     Upon information and belief, defendants' racial bias and animus against Drake was the

motivation for the disparate treatment.

219.     The individual defendants were cloaked with delegated authority by the City defendant.

220.     Upon information and belief, the individual defendants acted in accordance with the

policy, practice, custom, supervision, training, authorization, and/or acquiescence of the City

defendant.

221.     Some or all of the actions complained of were taken under color of state law, in violation

of 42 U.S.C. § 1983, and violated Drake's rights as guaranteed by the United States

Constitution and other Federal Laws.

222.     "In § 1983 actions, the applicable statute of limitations is the State's "general or residual

[state] statute [of limitations ] for personal injury actions . . ." Pearl v. City of Long Beach, 296

F.3d 76, 79 (2d Cir. 2002) (quoting Owens v. Okure, 488 U.S. 235, 249-50 (1989))".  Myers v.

New York, 1:14-cv-1492 (LEK/CFH), at *7 (N.D.N.Y. May 9, 2016).

-30-

223.    By Executive Order Number 202.8 issued by the New York State Governor Andrew Cuomo on March 20, 2020, all New York statutes of limitation was suspended as a result of the COVID-19 pandemic.  The suspension was subsequently lifted by Executive Order Number 202.67 on November 3, 2020.

224.    Accordingly, by virtue of the tolling of New York State statutes of limitation as a result of the COVID-19 pandemic, the November 2017 deprivation of Drake's rights as set forth in the preceding paragraphs is timely under 42 U.S.C § 1983.

225.    Defendants are therefore jointly and severally liable to Drake in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### 42 U.S.C. § 1983 DEPRIVATION OF DRAKE'S
### FOURTEENTH AMENDMENT DUE PROCESS RIGHTS
### (AGAINST ALL THE DEFENDANTS)

226.    Drake restates and reasserts all of the allegations set forth in paragraphs 1 through 225 as if the same is more fully set forth herein.

227.    N.Y. Civ. Serv. Law § 75 provides that " [a]n employee who at the time of questioning appears to be a potential subject of disciplinary action shall have a right to representation by his or her certified or recognized employee organization under article fourteen of this chapter and shall be notified in advance, in writing, of such right."

228.    Prior to the meeting between the defendants and Drake leading up to the signing of the LCA, the defendants did not notify Drake in advance in writing that he is a potential subject of disciplinary action and advise him of his right to representation.

229.    Drake had a right to representation by Pratt and the PBA who was his certified or recognized employee organization.

230.    Pratt and the PBA denied Drake any meaningful representation.

231.    N.Y. Civ. Serv. Law § 75 further provides that: "penalty or punishment may consist of a reprimand, a fine not to exceed one hundred dollars to be deducted from the salary or wages of such officer or employee, suspension without pay for a period not exceeding two months, demotion in grade and title, or dismissal from the service"

232.    The LCA, signed without written advance notice to Drake, imposed a "Forty Five (45) calendar days - unpaid suspension," in addition to the loss of "360 hours of time" from Drake's time bank.

233.    The 360 hours of unpaid time taken from Drake's time bank equals to thirty additional days of unpaid time taken from Drake.

234.    Accordingly, the cumulative unpaid days imposed against Drake in the LCA, exceeded the two months maximum suspension without pay set forth in N.Y. Civ. Serv. Law § 75.

235.    Both New York State and the City of Amsterdam adopt the principle of progressive discipline.

236.    A Last Chance Agreement by definition means that the signor had previously been the subject of more than one disciplinary action and is now being given the last chance to correct course or be terminated.

237.    Drake had never been the subject of any disciplinary action, nor had a notice of discipline being issued against Drake prior to being made to sign the Last Chance agreement under the circumstances previously described in this complaint.

238.    The adverse employment actions carried out by the defendants against Drake was more than just a mere inconvenience because the LCA suspended Drake for more than forty five days without pay, and further took away 360 hours of pay from Drake's time bank.

239.    Additionally, the December 2020 suspension without pay and the April 2021 termination was made possible by the LCA which was obtained in violation of Drake's constitutional rights.

As such the December 2020 suspension without pay and the April 2021 termination must also be set aside.

240.    The individual defendants were cloaked with delegated authority by the City defendant.

241.    Upon information and belief, the individual defendants acted in accordance with the policy, practice, custom, supervision, training, authorization, and/or acquiescence of the City defendant.

242.    The actions complained of were taken under color of state law, in violation of 42 U.S.C. § 1983, and violated Drake's rights as guaranteed by the United States Constitution and other Federal Laws.

243.    "In § 1983 actions, the applicable statute of limitations is the State's "general or residual [state] statute [of limitations ] for personal injury actions . . ." Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002) (quoting Owens v. Okure, 488 U.S. 235, 249-50 (1989))". Myers v. New York, 1:14-cv-1492 (LEK/CFH), at *7 (N.D.N.Y. May 9, 2016).

244.    By Executive Order Number 202.8 issued by the New York State Governor Andrew Cuomo on March 20, 2020, all New York statutes of limitation was suspended as a result of the COVID-19 pandemic.  The suspension was subsequently lifted by Executive Order Number 202.67 on November 3, 2020.

245.    Accordingly, by virtue of the tolling of New York State statutes of limitation as a result of the COVID-19 pandemic, the November 2017 deprivation of Drake's rights as set forth in the preceding paragraphs is timely under 42 U.S.C § 1983.

246.    Based upon the foregoing, the defendants deprived Drake of his right to due process as guaranteed by the Fourteenth Amendment.

247.    Defendants are therefore jointly and severally liable to Drake in an amount to be determined at trial.

SIXTH CAUSE OF ACTION:
42 U.S.C. § 1983 & 1985 CONSPIRACY
TO VIOLATE PLAINTIFF'S FEDERAL RIGHTS
(AGAINST ALL OF THE DEFENDANTS)

248.     Plaintiff reasserts and restates the allegations set forth in paragraphs 1 through 247 as if the same is fully set forth herein.

249.     As previously alleged, the individual defendants, the City defendant, and the PBA conspired and worked in concert in leaving Drake with no choice but to sign the injurious LCA.

250.     Additionally, as previously alleged, the individual defendants, the City defendant, and the PBA also conspired and worked in concert in violating Drake's other constitutional and Federal rights as alleged herein.

251.     The unlawful and unconstitutional acts of the defendants was a part and parcel of an agreement and conspiracy among the defendants to maliciously violate Drake's civil rights.

252.     Each of the defendants was aware of, agreed to, and/or approved of at least one of the overt acts in furtherance of this conspiracy.

253.     All of the causes of actions complained of were taken under color of state law, in violation of 42 U.S.C. § 1983, and violated Drake's rights as guaranteed by the United States constitution and other federal laws.

254.     By Executive Order Number 202.8 issued by the New York State Governor Andrew Cuomo on March 20, 2020, all New York statutes of limitation was suspended as a result of the COVID-19 pandemic.  The suspension was subsequently lifted by Executive Order Number 202.67 on November 3, 2020.

255.     Accordingly, by virtue of the tolling of New York State statutes of limitation as a result of the COVID-19 pandemic, the November 2017 deprivation of Drake's rights as set forth in the

preceding paragraphs is timely under 42 U.S.C § 1983.

256.    Accordingly, by virtue of the tolling of New York State statutes of limitation as a result of the COVID-19 pandemic, the November 2017 deprivation of Drake's rights as set forth in the preceding paragraphs as herein filed, is timely.

257.    Defendants are therefore jointly and severally liable to Drake in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Drake respectfully requests that this Honorable Court grant his demand for judgment against all of the defendants, jointly and severally, for the following reliefs:

a)  An order directing that defendants reinstate Drake to his due and appropriate employment position, with full benefits, including lost wages and front pay where appropriate.

b)  A judgment in favor of Drake for each and every cause of action against the defendants, for fair and reasonable compensatory damages, including: back pay, front pay, fringe benefits, pain and suffering, and other compensatory damages in an amount to be determined at trial.

c)  A judgment in favor of Drake and against all the individual defendants for punitive damages in an amount to be determined at trial.

d)  An award of Attorney's fees, plus court costs and disbursements for this action.

e)   All such other and further relief, as to this Court may seem just and proper.

Dated: May 25, 2021
Albany, New York

UBA LAW FIRM, P.C.

By: _____
Vincent U. Uba, Esq.,  *Bar Roll No: 516259*
*Attorney for Plaintiff,*
744 Broadway, Albany, NY 12207
Tel: 518-533-4943

State of New York            }

County of Albany            }ss.


     ALAN M. DRAKE, being duly sworn, deposes and says that he is the plaintiff herein; that he has read the foregoing Verified Complaint, and knows the contents thereof to be true, except as to those matters therein stated to be alleged upon information and belief, and that as to those matters he believes them to be true.  He further states that the sources of his information and belief are documents and information obtained from defendants, witnesses, and other publicly available sources.


_____

ALAN M. DRAKE


Subscribed and Sworn to before me
this 25th day of   May, 2021

_____
NOTARY PUBLIC

VINCENT UCHENNA UBA
NOTARY PUBLIC STATE OF NEW YORK
ALBANY COUNTY
LIC. #02UB6221465
COMM. EXP. 05|03|2022

-36-