UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ALAN M. DRAKE,

                          Plaintiff,

              -v-                          1:21-CV-615

CITY OF AMSTERDAM POLICE
DEPARTMENT, GREGORY J.
CULICK, JOHN THOMAS, THOMAS
HENNESSY, THOMAS NETHAWAY,
LEON PRATT, AMSTERDAM POLICE
BENEVOLENT ASSOCIATION, INC.,
and MICHAEL CINQUANTI,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                        OF COUNSEL:

UBA LAW FIRM, P.C.                  VINCENT U. UBA, ESQ.
Attorneys for Plaintiff
744 Broadway
Albany, NY 12207

ROEMER WALLENS                      EARL T. REDDING, ESQ.
    GOLD & MINEAUX LLP
Attorneys for City Defendants
13 Columbia Circle
Albany, NY 12203

THE REHFUSS LAW FIRM, P.C.          ABIGAIL W. REHFUSS, ESQ.
Attorneys for PBA Defendants        STEPHEN J. REHFUSS, ESQ.
40 British American Boulevard
Latham, NY 12110

DAVID N. HURD
United States District Judge

## DECISION and ORDER

## I. INTRODUCTION

On May 26, 2021, plaintiff Alan M. Drake ("Drake" or "plaintiff"), a black police officer formerly employed by the City of Amsterdam, New York, filed this discrimination action against defendants the City of Amsterdam Police Department (the "City"), Chief of Police Gregory J. Culick ("Chief Culick"), Deputy Chief & Chief of Police John Thomas[1] ("Chief Thomas"), Lieutenant Thomas Hennessy ("Lt. Hennessy"), Lieutenant Thomas Nethaway ("Lt. Nethaway"), the Police Benevolent Association, Inc. (the "PBA"), and former PBA President Leon Pratt ("PBA President Pratt").  Plaintiff later amended his pleading to name Mayor Michael Cinquanti ("Mayor Cinquanti") as well.

Plaintiff's twelve-count, third amended complaint asserts claims against these eight named defendants under 42 U.S.C. § 1981 (Counts One, Two, and Three), 42 U.S.C. §§ 1983 and 1985 (Counts Four, Five, and Six), Title VII of the Civil Rights Act of 1964 (Counts Seven, Eight, and Nine), and New York State Human Rights Law (Counts Ten, Eleven, and Twelve).  Dkt. No. 49.

---

[1]  Defendant Thomas was a Sergeant for certain events, a Deputy Chief of Police for others, and later became the Chief of Police for certain events near the conclusion of the narrative.

On February 28, 2024, the PBA and PBA President Pratt (collectively the "PBA defendants") moved under Federal Rule of Civil Procedure ("Rule") 56 for summary judgment dismissing Drake's operative complaint insofar as it asserted any claims against either of them.  Dkt. No. 86.

On February 29, 2024, the City, Mayor Cinquanti, Chief Culick, Chief Thomas, Lt. Hennessy, and Lt. Nethaway (collectively the "City defendants") moved under Rule 56 for summary judgment dismissing Drake's operative complaint insofar as it asserted any claims against them.  Dkt. No. 87.

On May 14, 2024, Drake opposed both of these motions and cross-moved under Rule 56 for summary judgment in his own favor.  Dkt. No. 95.  In turn, the PBA defendants and the City defendants have each opposed plaintiff's cross-motion and replied in further support of their own.  Dkt. Nos. 103, 105.

The three motions are fully briefed and will be considered on the basis of the submissions without oral argument.

## II.  **BACKGROUND**

This section is divided into three overlapping factual narratives, each of which has been developed from a careful review of the movant's respective statement of material facts.  Notably, however, all of this combined briefing actually does a fairly poor job of structuring the story in a way that might be comprehensible to the ordinary reader, or at least to someone who has not spent the last few years actively involved in this civil rights litigation.

For instance, some of the basic historical facts are presented haphazardly, introduced out of chronological order, and spread out across the hundreds of pages of filings collectively offered by the parties.  Other important factual issues are framed in generalized terms devoid of the kind of baseline details ordinarily needed to make meaningful legal analysis possible: the who, what, where, and when of the distinct event or events in question.

As a result of this and other, related organizational shortcomings, Drake's statement of material facts—which runs to fifty-seven full pages—sometimes reads more like a *seriatim* airing of grievances stored up over his decade-plus on the job than as a focused, detail-oriented narrative about how he suffered one or more instances of *actionable* racial mistreatment that can be traced to one or more of the named defendants during his tenure as one of the only black officers in the City's police department.  The same basic problem is true of defendants' filings: material facts are presented out of chronological order, often in an argumentative form, and sometimes without necessary context.

The factual narrative offered by each of the three movants has been re-organized into a more coherent form and will be dutifully recounted in this section.  In so doing, the Court has tried to excise or omit facts that have been offered by a party but are clearly unsupported by the record, or those that

might well exist somewhere in the discovery record but have been completely improperly cited by the movant.[2]

### A.  <u>Plaintiff's Statement of Material Facts</u>

The first narrative to be recounted is plaintiff's.  It is the longest and most comprehensive of the parties' three offerings.  Defendants have responded to plaintiff's fifty-seven-page statement of material facts with separate, one-hundred-plus-page-long responses that dispute most of plaintiff's version of events.  Dkt. No. 103-3 (PBA defendants); Dkt. No. 105-1 (City defendants).  Accordingly, this section of the factual background credits plaintiff's offering (at least to the extent it is properly supported with specific record citations) while noting only a *subset* of the particularly relevant disputed matters.

On January 5, 2009, the City's police department hired Drake, a black man, as a police officer.  Pl.'s Facts, Dkt. No. 95-97 ¶¶ 3, 6.  The City's police department is small—it has just thirty-nine full-time officers.  *Id*. ¶ 61.  And from the date of his hiring until September of 2016, plaintiff was the only black employee in the department.  *Id*. ¶ 62.

---

[2] The rules governing summary judgment routinely trip up litigants.  *See, e.g.*, *Krul v. DeJoy*, – F. Supp. 3d–, 2023 WL 8449589, at *14 (N.D.N.Y. Dec. 6, 2023) (describing basic operation of this District's Local Rules and summarizing various iterations of party-driven error).  In this case, the most obvious shortcoming (but not the only one) is plaintiff's inconsistent adherence to Local Rule 56.1(a) and (b), both of which require a *specific* citation to the record where a certain fact (or factual issue) is established.  Only some of plaintiff's citations are "specific."  Many others rely generally on non-specific citations to entire documents, such as plaintiff's forty-three page declaration.  *See, e.g.*, Dkt. No. 95-97 ¶ 51 (supporting second alleged fact dispute with a general citation to a declaration that is forty-three pages in length).

Drake came to the job with prior law enforcement experience: he had been working as a deputy for the Montgomery County Sheriff's Department.  Pl.'s Facts ¶ 5.  According to plaintiff, Lt. Nethaway encouraged him to apply and offered him the job "on the spot."  *Id*.  But shortly after he began working for the City, plaintiff was told by unnamed white officers that he had only been hired because he was a black man.  *Id*. ¶ 6.  These unnamed officers called him a "show piece" and told him that the City only hired him because they wanted to look more inclusive during a then-pending racial discrimination suit.  *Id*.  According to plaintiff, these unnamed officers would "constantly harass" him "because of what he did or wore in expressing his culture."  *Id*.

As a new hire, Drake was assigned to complete his field training under the supervision of Lt. Nethaway.  Pl.'s Facts ¶ 7.  However, Lt. Nethaway did not provide plaintiff with very much training.  He did not train plaintiff "on how to handle basic complaints and the different paperwork utilized by" the police department.  *Id*. ¶ 8.  According to plaintiff, Lt. Nethaway never completed certain written evaluations of plaintiff's performance, either.  *Id*. ¶¶ 9–10.

At the conclusion of this inadequate training, Drake was assigned to work the "night shift" desk by himself.  Pl.'s Facts ¶ 11.  Plaintiff learned through the rumor mill that some unnamed white officers in the department called him "stupid" and "not smart."  *Id*. ¶ 12.  According to plaintiff, Chief Culick denied plaintiff the opportunity to participate in certain unspecified training

and advancement schools that were periodically offered to other, unnamed police officers. *Id.* ¶¶ 13–14, 15–16, 19–20.

At some point, non-party then-Chief of Police Brownell told Drake that "the target on [his] back is a lot bigger . . . because of [p]laintiff being a Black police officer," or words to that effect. Pl.'s Facts ¶ 22. Plaintiff was stunned and highly offended by this statement. *Id.* ¶ 23. Plaintiff contends that Chief Brownell and other, unnamed white officers "continuously, conspicuously, and proudly display[ed] [w]hite supremacist symbols." *Id.* ¶ 24.[3] Plaintiff further contends that unnamed co-workers "widely addressed" him as "hot chocolate." *Id.* ¶ 43. He found this racially offensive. *Id.* ¶ 44. "At various times and on numerous occasions," Drake complained to the City and to the PBA leadership about constant or ongoing racial harassment. *Id.* ¶¶ 33–35.

Drake contends that unnamed department officials instituted the "Drake rule" (elsewhere called the "Drake rules") which included a "racial stereotype" that "if anything goes wrong at the workplace blame it on Drake, say that Drake did it, or that it is Drake's fault," or similar words to that effect. Pl.'s Facts ¶ 45.

---

[3] Drake contends that PBA President Pratt has an "SS" tattoo. Pl.'s Facts ¶ 29. Plaintiff contends that this tattoo is a symbol of white supremacy and highly offensive to him. *Id.* ¶¶ 29–31. Pratt admits that he has a tattoo with the letters "SS," denies that it is a Nazi symbol, and contends that it represents the initials of his two children. PBA Defs.' Resp., Dkt. No. 103-3 ¶ 29. According to plaintiff, then-Chief Culick did not take disciplinary action against Pratt for his "SS" tattoo even though the tattoo violated the department's written anti-discrimination policy. Pl.'s Facts ¶¶ 32, 36.

Drake contends that he was not allowed to exercise certain benefits or privileges of his seniority over unnamed white officers. Pl.'s Facts ¶ 47. In January of 2016, plaintiff had attained seniority over some more junior white police officers. *Id*. ¶ 50. Ordinarily, this would have entitled him to choose a preferred desk. *Id*. ¶¶ 48–50. But someone in the department changed the shift rules and deprived him of this seniority benefit. *Id*. ¶ 50. According to plaintiff, this change in the "preferred desk" rules was part of the so-called "Drake rule" or "Drake rules." *Id*. Plaintiff asserts that he witnessed a junior white officer named Kyle Harris receive the benefit of the "old" desk rule on September 20, 2018 and November 1, 2018. *Id*. Plaintiff reported this to PBA officials and to his supervisors, who did not act. *Id*. ¶¶ 53–56.

On October 6, 2016, Lt. Nethaway and Lt. Thomas began investigating Drake for allegedly sexually assaulting a woman named Christina Moody, who was known to use several aliases. Pl.'s Facts ¶¶ 127–130. Plaintiff, for his part, acknowledges the accusation and the investigation, but contends that the investigation was conducted in an irregular manner and produced contradictory results. *Id*. ¶¶ 132–34.

In February of 2017, a non-party sergeant named DiCaprio threatened to write Drake up for wearing a "Columbia brand charcoal gray winter boot" and told plaintiff "that his boots [were] a big topic of discussion at [ ] staff meetings upstairs." Pl.'s Facts ¶ 25. Plaintiff was "greatly troubled" by this

information and "highly offended" by DiCaprio's remarks. *Id*. ¶ 26. Plaintiff reported this to PBA President Pratt, who did not act. *Id*. ¶¶ 27–28.

On November 2, 2017, then-Chief Culick told Drake he was being placed on immediate suspension without pay. Pl.'s Facts ¶ 107. Plaintiff had never been the subject of prior discipline.[4] *Id*. ¶ 65. Thereafter, on November 2 and November 6, 2017, two disciplinary meetings were held. *Id*. ¶ 78. Plaintiff retained his own counsel on an emergency basis. *Id*. Plaintiff contends that he did not receive any advance written notice of these disciplinary meetings, which was required by the Collective Bargaining Agreement and New York Civil Service Law. *Id*. ¶¶ 79, 82. Plaintiff also contends that defendants gave him "little to no information or evidence forming the basis of the disciplinary allegations." *Id*. ¶¶ 83–84. According to plaintiff, defendants pressured him into signing a "Last Chance Agreement." *Id*. ¶¶ 85–105.

Drake signed this Last Chance Agreement on November 6, 2017. Pl.'s Facts ¶ 122. As relevant here, the Last Chance Agreement provided that:

> Should a jointly selected fair and impartial final and binding arbitrator determine that Alan M. Drake is guilty of ANY major and intentional violation of the Amsterdam Police Department Rules and Regulations or Policies and Procedures, said determination will result in [his] immediate dismissal from duty.

---

[4] Elsewhere, however, plaintiff admits that he received prior "counseling memos." Pl.'s Resp. to PBA Defs.' Facts, Dkt. No. 95-6 ¶ 7. Plaintiff "declares" that the department "issued [the] majority of the counseling memos in furtherance of their unlawful discrimination." *Id*. This framing tends to indicate that at least some non-zero number of these counseling memos were valid discipline. *See id*.

*See* Dkt. No. 95-82 at 21; Dkt. No. 95-29.  The Last Chance Agreement also required plaintiff to take psychological counseling, which he completed.  Pl.'s Facts ¶¶ 123–24.  Thereafter, plaintiff returned to work.  *Id.* ¶ 126.

Drake contends that this Agreement is missing some signatures and was procured in an irregular fashion.[5]  Pl.'s Facts ¶¶ 136–148.  Plaintiff identifies disciplinary incidents involving non-parties Lisicki, Lochner, and Santiago as well as defendants PBA President Pratt, Lt. Hennessy, and Chief Thomas from 2001, 2002, 2009, 2013, 2018, 2019, and 2020.  *Id.* ¶¶ 150–156, 158–183, 186–191.  According to plaintiff, these white officers were treated differently and received better or more thorough representation from the PBA.  *See id.*

On June 3, 2020, Drake and his wife sent an e-mail to the newly elected mayor in which they complained about the "systemic racism" the City had "perpetrated" against plaintiff.  Pl.'s Facts ¶ 198.  According to this e-mail, plaintiff, then a senior police officer at the department, was being "overlooked by the administration and the Detective Bureau for training, professional development, special details, and assignments compared to his white junior [police officer] counterparts."  *Id.* ¶ 17.  Plaintiff contends he had reported this harassment to other municipal officials including "his Sergeants, [Chief]

_____

[5] Plaintiff contends that he did not receive a copy of the formal Notice of Discipline that led to this Last Chance Agreement until January of 2021, when it was disclosed to him in connection with a different disciplinary proceeding.  Pl.'s Facts ¶ 108.  Plaintiff contends that it was clear that these charges were improper, time-barred, and the product of race-motivated deception.  *Id.* ¶¶ 109–121.

Culick, [non-party] Mayor Thane, and various successive PBA Presidents including [PBA President] Pratt," but that each of these officials had failed to act. *Id*. ¶¶ 192–197.

On June 5, 2020, Mayor Cinquanti appointed Chief Thomas to be the new Chief of Police. Pl.'s Facts ¶ 200. Mayor Cinquanti talked to Chief Thomas about Drake and his wife's e-mail. *Id*. ¶ 201. Thereafter, Mayor Cinquanti recommended that plaintiff and his wife sit down with the new Chief of Police to discuss the issues raised in their e-mail. *Id*. ¶ 202. But plaintiff and his wife replied to Mayor Cinquanti and told him that they did not want to sit down with the new Chief of Police at that time. *Id*. ¶ 203.

On July 9, 2020, non-party PBA President Aurelio Fiorillo texted Drake a message stating that Chief Thomas wanted to talk with him anyway. Pl.'s Facts ¶ 204. As plaintiff explains, he knew this discussion was going to be about certain "*de minimis* incidents" that happened on December 19, 2019 and April 6, 2020. *Id*. ¶ 205. According to plaintiff, these two "*de minimis* incidents" had already been handled under the previous Chief of Police. *Id*.

Drake soon met with Chief Thomas. According to plaintiff, Chief Thomas "made it clear that he want[ed] [p]laintiff gone." Pl.'s Facts ¶ 206. Plaintiff contends that Chief Thomas initially offered to suspend plaintiff, but plaintiff refused because, in his view, the two "*de minimis*" incidents had already been handled under the prior Chief of Police. *Id*. ¶¶ 207–209.

On December 23, 2020, Drake received a Notice of Discipline that included four charges of misconduct.  Dkt. No. 95-44.  Plaintiff was suspended.  Pl.'s Facts ¶¶ 18, 208.  Thereafter, the parties selected Arbitrator Timothy Taylor (the "Arbitrator"), who is black, to hear the dispute.  Dkt. No. 95-82.  The Arbitrator conducted a hearing remotely on January 29, 2021, and February 10, 2021.[6]  *Id*.  Thereafter, the parties submitted post-hearing briefs.  *Id*.

In total, the Notice of Discipline charged Drake with misconduct arising from four dates.

Charge One arose from an incident on December 20, 2019:

> Specification 1: On December 20, 2019, at approximately 0840, you responded as a backup officer to assist with traffic control relative to a motor vehicle accident which occurred on Church Street.  You responded to the scene of the accident, forcing your vehicle through traffic which was still attempting to yield to emergency lights at the scene of the accident. During your attempt to force your way through traffic, the passenger side view mirror of your vehicle struck the driver's side tail lamp of Mr. Sean Piasecki's 2020 Toyota Tundra truck, causing damage both to Mr. Piasecki's truck and the police department vehicle you were operating.
>
> You left the scene of the accident and did not make an effort to immediately speak to the operator of the truck, Mr. Piasecki, to acknowledge the fact that you hit his vehicle.  You also did not advise dispatch or your supervisor, Sergeant Jacob Gifford[,] that the

---

[6] Plaintiff asserts various irregularities by the PBA and by Chief Thomas in connection with this arbitration.  Pl.'s Facts ¶¶ 271–291.  Plaintiff also asserts that Mayor Cinquanti had an obligation to conduct his own investigation rather than rely on Chief Thomas.  *Id*. ¶¶ 290–293.

accident had occurred as required by then applicable RR06-023(4).

Your failure to timely report the accident to dispatch or your supervisor constitutes a violation of then applicable RR06-023(4) and misconduct under Section 75 of the New York State Civil Service Law.  Your failure to take reasonable care to avoid damaging a department vehicle constitutes a violation of then applicable RR06-023(6) and misconduct under Section 75 of the New York State Civil Service Law.

Specification 2: On December 20, 2019, at approximately 0840, you responded as a backup officer to assist with traffic control relative to a motor vehicle accident which occurred on Church Street.  You responded to the scene of the accident, forcing your vehicle through traffic which was still attempting to yield to emergency lights at the scene of the accident. During your attempt to force your way through traffic, the passenger side view mirror of your vehicle struck the driver's side tail lamp of Mr. Sean Piasecki's 2020 Toyota Tundra truck, causing damaging both to Mr. Piasecki's truck and the police department vehicle you were operating.

You left the scene of the accident and did not make an effort to immediately speak to the operator of the truck, Mr. Piasecki, to acknowledge the fact that you hit his vehicle.

Your failure to speak to Mr. Piasecki after hitting his vehicle resulted in Mr. Piasecki's contacting Detective Chris Cuddy regarding the accident who, in turn, notified Sergeant Jacob Gifford.  Your failure to immediately speak to Mr. Piasecki at the accident scene depicted the police department in an unfavorable light, constituting a violation of then applicable RR06-010(3).  Your actions also constitute misconduct under Section 75 of the New York State Civil Service Law.

- 13 -

Dkt. No. 95-82 at 2 –4.

Drake acknowledges this December 20, 2019 traffic incident occurred but contends that his former supervisor, non-party Sergeant Gifford, conducted an investigation and concluded that plaintiff was not driving in a "wanton or reckless" manner and that plaintiff did not intentionally "leave the scene" of the incident.  Pl.'s Facts ¶ 209.

Charge Two arose from an incident on April 6, 2020:

> Specification 1: On February 15, 2016, you received a counselling memorandum, attached hereto and a made a part hereof, for substandard performance while on desk duty.  On April 6, 2020 at approximately 12:04 p.m., while assigned to desk duty, you took a telephone call from Ann Ramdass-Hogue, a nursing supervisor at St. Mary's [Hospital].  She reported that a female patient was being treated in the E.R. because of her exposure to someone who had COVID-19.  She further reported that the woman grew impatient and left the E.R. against medical advice, allegedly intentionally coughing on people on her way out, without wearing a mask.  Hogue stated she had witnesses to what had occurred.
>
> While you took all of the caller's information, you did not ask her if she wished to press charges against the patient if warranted.  You also did not generate a blotter entry or dispatch an officer to further interview Nurse Ramdass-Hogue, investigate the complaint and speak with witnesses.  The day after the call from Nurse Ramdass-Hogue was received, the CEO of St. Mary's Hospital contacted then-Deputy Chief Thomas and expressed his concern that no one from the Amsterdam Police Department came to the hospital

the previous day to follow up on the call and investigate the matter.

Your actions constitute a violation of then applicable RR06-037(5), Inattention to Duty, and then applicable RR067-037(52), Failure to take, record, and act upon complaints except as prescribed by department procedures, and misconduct.

Your failure to take any action on the complaint you received resulted in St. Mary's Hospital's CEO contacting the Department the following day, April 7, 2020, to ask why not action was taken on Ms. Ramdass-Hogue's call, in light of the pandemic and the potential impact on public health. Your failure to take any action regarding Ms. Ramdass-Hogue's call caused the Department's reputation to be adversely affected. Your conduct constitutes a violation of then applicable RR06-017 and misconduct under Section 75 of the New York State Civil Service Law.

Dkt. No. 95-82 at 4–5.

Drake acknowledges this April 6, 2020 call but contends that the nurse told him "she was just calling to make a report of the incident" and that, in light of the uncertainty from the new COVID-19 pandemic, then-Chief Culick ordered police officers to "handle anything they could over the phone instead of going to addresses." Pl.'s Facts ¶¶ 211–212. Plaintiff contends that white officers were not issued discipline of this nature. *Id*. ¶ 213. Plaintiff further contends that non-party Sergeant Gifford conducted an investigation and concluded that plaintiff should only receive "written counseling" rather than formal discipline. *Id*. ¶¶ 214–215.

Charge Three arose from an incident on September 3, 2020:

Specification 1: On September 3, 2020, you were dispatched at 11:28 a.m. to a call at 18 Garden Street in the City of Amsterdam.   The call involved a domestic incident regarding a mother and daughter arguing over a duffel bag and was made by the daughter.  You did not timely respond to the call.  At 11:56 a.m., a second call came in from the first caller's mother, wondering if the police were going to respond because the mother had an injury and had taken a picture of an injury to her arm.  At 11:58 a.m., the dispatcher called you again, inquired as to your expected time of arrival[,] and informed you that there were now possible injuries.  You responded that you would be there in 60 seconds.  You then called out at 12:00 p.m.

In your written response regarding the call, you stated you were talking to an employee from Herkimer Industries regarding supplies for the police department and making a call to your doctors between the time of the initial call and when you ultimately responded to the call.  When you received the initial call dispatching you at 11:28 a.m., you did not inform the dispatcher of any reason why your response to the call would be delayed or that you were unable to respond to the call for some reason(s).

Your report narrative regarding the call states that there were no injuries when in fact there [was] an injury to the left arm of Ms. Taglialatela [who] was[ ] the original complainant's mother.  The injury was allegedly caused by one of the other parties involved in the call pushing Ms. Taglialatela into the wall.  Your narrative report also did not reflect that information even though it was provided to you by Ms. Taglialatela at the scene.   Your narrative report therefore contained false information and was incomplete in that it did not contain all relevant information regarding the call.

> Your conduct in failing to timely respond to a call for service and submitting a false and inaccurate report violates: Penal Law 175.30, Offering False Instrument for Filing in the Second Degree; Amsterdam Police Department Policy 309.3, Response to Calls; Amsterdam Police Department Policy 323.4, Report Preparation; Amsterdam Police Department Policy 320.5.7(b), Unsatisfactory Work Performance and Delay in Performing Work; Amsterdam Police Department Policy 320.5.8(a), Misrepresenting Material Facts; Amsterdam Police Department Policy 320.5.9(m), On-Duty Conduct Unbecoming of an Officer; and constitutes misconduct under Section 75 of the New York State Civil Service Law.

Dkt. No. 95-82 at 5–6.

Drake acknowledges this September 3, 2020 dispatch, concedes that he was on the phone with a salesman for the police department and on hold with his doctor's office, but contends that the dispatcher initially flagged it as a non-emergency call.  Pl.'s Facts ¶¶ 226, 228–229.  According to plaintiff, he responded promptly when he learned new information from the dispatcher about the possible existence of injuries.  *Id.* ¶¶ 231–232.  Plaintiff contends that a white police officer named Seelow also heard the call on the radio and did not respond until he learned the updated information of possible injuries at the scene, either.  *Id.* ¶¶ 233–34.  Plaintiff contends that there is no clear departmental rule or policy about how quickly an officer must respond to a dispatch call.  *Id.* ¶¶ 236–241.  According to plaintiff, Chief Thomas and Lt.

Hennessy did not discipline Seelow for the exact same conduct even though they alleged formal discipline against plaintiff. *Id.* ¶¶ 223–224.

Charge Four arose from an incident on November 22, 2020:

> Specification 1: On November 22, 2020, you were dispatched to a 911 open line call to 72 Bunn Street at 12:45 p.m. You did not arrive at the scene and call out until 1:03 p.m. It took you eighteen (18) minutes to respond to the call, an excessive amount of time.
>
> Your delay in responding to the call constitutes a violation of: Amsterdam Police Department Policy 309.2, Policy; Amsterdam Police Department 309.3, Response to Non-Emergency Calls; Amsterdam Police Department Policy 320.5.7(b), Unsatisfactory Work Performance and Delay in Performing Work; Amsterdam Police Department Policy 320.5.9(m), On-Duty Conduct Unbecoming of an Officer; and constitutes misconduct under Section 75 of the New York State Civil Service Law.

Dkt. No. 95-82 at 6 –7

Drake acknowledges that he was dispatched to this call, but contends that he responded to the location, concluded that there was no one in the area in need of services, updated dispatch with this information, and then completed the appropriate paperwork. Pl.'s Facts ¶ 218. According to plaintiff, Chief Thomas never asked plaintiff why it took him eighteen minutes to report back to dispatch about this so-called "hangup" call. *Id.* ¶ 219.

On April 26, 2021, the Arbitrator found Drake <u>not guilty</u> of Charges One, Two, and Four. Dkt. No. 95-82 at 17. However, the Arbitrator found plaintiff

guilty of Charge Three; *i.e.*, failing to respond promptly to the dispatch call on September 3, 2020 where a mother and daughter argued over a bag. *Id.* at 19–20. As noted *supra*, plaintiff acknowledges that he initially chose to wait on hold with his doctor and continue speaking with the salesperson instead of responding to this dispatch call. But plaintiff contends that the dispatcher told him that he should not rush to the call. *See* Pl.'s Facts ¶ 267. According to plaintiff, this dispatcher should have been called to testify as a witness at the arbitration proceeding because this testimony would have justified plaintiff's delay. *Id.* ¶¶ 267–269.

In any event, because the 2017 Last Chance Agreement provided that any future violation of departmental rules or policies would lead to plaintiff's dismissal, the Arbitrator found that the appropriate penalty was immediate termination from duty. Dkt. No. 95-82 at 21–22; Pl.'s Facts ¶ 64.

## B. **City Defendants**

The second narrative comes from the City defendants. Factual assertions that plaintiff has validly placed in dispute—with "specific" citations to the record in accordance with the Local Rules—have been noted. But denials accompanied by general citations to substantial portions of the record—such as the repeated instances in which plaintiff issues a denial supported only by "Drake Declaration and cross motion papers"—without any pinpoint citations to those large documents—have *not* been noted and will be deemed admitted

for the purpose of resolving the City defendants' motion.  The same is true of "denials" that include pinpoint citations, but fail to place the offered fact in dispute while raising other, tangentially related facts.  *See, e.g.*, Pl.'s Resp. to City Defs.' Facts, Dkt. No. 95-5 ¶ 115 (purporting to "deny" the assertion that attorney Keach participated in a certain meeting by stating that plaintiff "had no information to give Mr. Keach").

The City's police department consists of thirty-nine full-time police officers and two call dispatchers.  City Defs.' Facts ¶¶ 24–25.  The department hired Drake on January 5, 2009 to be a patrol officer after Lt. Nethaway told him to apply.  *Id.* ¶¶ 33, 35.  Plaintiff had prior law enforcement experience with the Village of Canajoharie police department and the Montgomery County Sheriff's Department.  *Id.* ¶¶ 34, 44–45.  Plaintiff received a copy of the City's employee handbook, but he did not receive a copy of its policy on harassment prevention.  *Id.* ¶ 35; Pl.'s Resp. to City Defs.' Facts ¶ 37.

Shortly after being hired, Drake began working the "day shift" under the supervision of Lt. Nethaway, who was assigned to be plaintiff's "field training officer."  City Defs.' Facts ¶¶ 38, 55.  The "day shift" and "night shift" were each twelve-hour shifts that ran from about 6:00 or 7:00 a.m. to 6:00 or 7:00 p.m.  *Id.* ¶¶ 40–42.  Since plaintiff had already attended the police academy, he knew the basics of being a police officer.  *Id.* ¶ 43.  But plaintiff says that he should have received more specific training about the City's policies and

practices. Pl.'s Resp. to City Defs.' Facts ¶ 42. For instance, plaintiff did not know how to take witness statements in accordance with the department's particular policy. *Id*. ¶ 48. According to plaintiff, Lt. Nethaway gave him "little to no training." Pl.'s Resp. to City Defs.' Facts ¶¶ 55, 58.

Drake's training under Lt. Nethaway lasted about a month or two. City Defs.' Facts ¶¶ 56–57. Afterward, plaintiff was assigned to work the "night shift" desk "all by himself," which was difficult for him to do without proper training. Pl.'s Resp. to City Defs.' Facts ¶ 39. Thereafter, plaintiff submitted a written request to be a "certified seat belt officer," but he was not selected for this training opportunity. *Id*. ¶ 72. No white police officers were selected for this training opportunity, either. *See id*.

On another occasion, Drake went to a different training in Johnstown, but it was cancelled. Pl.'s Resp. to City Defs.' Facts ¶ 77. Plaintiff was paid for his time, but felt embarrassed about being sent to a canceled event. *Id*. ¶ 78. Plaintiff did not request certain other trainings, but records show that white police officers received "substantially more" opportunities. *Id*. ¶ 79. During his tenure with the City, plaintiff also sat for two Civil Service exams, which are required for promotion. City Defs.' Facts ¶¶ 49–53. Plaintiff failed both exams. *Id*. ¶ 54.

Drake was sometimes called "hot chocolate" by some unnamed officers around the police department. Pl.'s Resp. to City Defs.' Facts ¶ 94. But the

City defendants deny that they used the phrase the "Drake rule" or the "Drake rules."  City Defs.' Facts ¶¶ 80–84.

Drake contends that the City defendants "instituted, implemented, and perpetuated a racially hostile work environment which fostered the implementation of the 'Drake Rule.'"  Pl.'s Resp. to City Defs.' Facts ¶¶ 80–84.  The City defendants deny that any members of the police department called plaintiff a "show piece," "stupid," or "not smart."  City Defs.' Facts ¶¶ 88–91.  However, plaintiff contends that "Pratt and other [City] employees made similar comments" and claims that employees were "spreading word behind [his] back."  Pl.'s Resp. to City Defs.' Facts ¶¶ 88–91.

In 2016, Chief Culick directed Lt. Nethaway and Chief Thomas to conduct an investigation into a social media post that suggested Drake might have "propositioned, asked out, threatened or sexually harassed" one or more local women.  City Defs.' Facts ¶¶ 95–96.  They obtained several statements from women who detailed their interactions with plaintiff.  *Id.* ¶ 97.  For instance, one woman accused plaintiff of stopping her and "conducting a very slow pat down of her crotch area."  *Id.* ¶ 98.  Plaintiff denies the veracity of some of these statements but admits that he had a "relationship" with two different women "all during his off-duty hours."  Pl.'s Resp. to City Defs.' Facts ¶ 101.

Chief Culick ran this information by the District Attorney, who elected not to pursue charges.  City Defs.' Facts ¶ 99; Pl.'s Resp. to City Defs.' Facts ¶ 99.

But Chief Culick decided to pursue departmental discipline.  City Defs.' Facts ¶ 108.  Thereafter, Chief Culick, plaintiff, and others held a meeting about the allegations.  *Id*. ¶¶ 110, 125.  Plaintiff's attorney, Elmer Keach, participated by telephone.  *Id*. ¶ 111.  Attorney Rocco DePerno, a PBA representative, was also present for this meeting.  *See id*. ¶ 112.

Drake contends that attorney DePerno and other PBA representatives, such as PBA President Pratt, were unhelpful.  Pl.'s Resp. to City Defs.' Facts ¶ 113.  Although plaintiff contends that internal discipline "was time barred as at the time Defendants disciplined" him, Pl.'s Resp. to City Defs.' Facts ¶¶ 101–104, and claims that defendants threatened him with criminal charges and other penalties, *id*. ¶¶ 116–118, he admits that he signed a Last Chance Agreement on November 6, 2017.[7]  City Defs.' Facts ¶¶ 105, 126.  Lt. Nethaway retired in June of 2018.  *Id*. ¶ 32.

On January 1, 2020, Mayor Cinquanti assumed office and took charge of the police department.  City Defs.' Facts ¶ 29.  Chief Culick retired in June of that year.  *Id*. ¶ 27.  Soon after, Mayor Cinquanti appointed Chief Thomas to replace him.  *Id*. ¶ 30.

On December 23, 2020, Drake received a Notice of Discipline.  City Defs.' Facts ¶ 132.  Plaintiff knew the Last Chance Agreement was still in effect,

---

[7]  A white officer, Lt. Hennessy, signed a similar stipulation of settlement on December 18, 2002. City Defs.' Facts ¶¶ 128–129.

but declined an offer to settle the charges. *Id*. ¶¶ 133–134. The matter went to an arbitration hearing. *Id*. ¶ 137–138. At the arbitration hearing, plaintiff was represented by attorney James Tuttle. *Id*. ¶ 141. But plaintiff did not discuss the case with attorney Tuttle before the hearing. Pl.'s Resp. to City Defs.' Facts ¶ 142.

Drake testified at the hearing. City Defs.' Facts ¶ 142. There, plaintiff admitted that he failed to respond to a certain dispatch call because he was holding on telephone calls with a salesperson and with his doctor's office. *Id*. ¶ 144. Accordingly, the arbitrator found plaintiff guilty of charge number three. *Id*. ¶ 149. Because the Last Chance Agreement was in effect, the arbitrator ordered plaintiff dismissed from duty effective April 26, 2021. *Id*. ¶¶ 154–155.

### C. **PBA Defendants**

The third and shortest narrative comes from the PBA defendants. As before, assertions that plaintiff has validly placed in dispute—with "specific" citations to the record in accordance with the Local Rules—have been noted. But denials accompanied by general citations to substantial portions of the record—such as the frequent instances in which plaintiff issues a denial supported by, *inter alia*, "Drake Declaration and exhibits, Uba declaration and exhibits" without any pinpoint citations to those documents—have not been noted and will be deemed admitted for the purpose of resolving the PBA

defendants' motion.  The same is true of the "denials" that include pinpoint citations, but fail to actually place the offered fact in dispute while merely raising other, possibly tangentially related facts.  *See, e.g.*, Pl.'s Resp. to PBA Defs.' Facts ¶ 9 (purporting to "deny" the assertion that PBA President Pratt contacted an attorney to represent plaintiff by stating that the proposed attorney had an undisclosed conflict of interest).

In 2017, Pratt was a detective in the police department.  PBA Defs.' Facts, Dkt. No. 86-2 ¶¶ 1, 4–5.  He was also the PBA President.  *Id*.  In October of that year, he learned from Chief of Police Culick that plaintiff "was about to be brought up on charges regarding serious allegations of misconduct by numerous women."  *Id*. ¶ 6.  Plaintiff had received previous "counseling memos" for other on-duty conduct.  *Id*. ¶ 7.  Plaintiff admits that he received these memos but contends that they were products of discrimination rather than valid discipline.  Pl.'s Resp. to PBA Defs.' Facts, Dkt. No. 95-6 ¶ 7.  Plaintiff further contends that the charges levied against him in 2017 were "time barred, fraudulently obtained, and without merit."  *Id*. ¶ 8.

Drake retained attorney Elmer Keach to assist him.  Pl.'s Resp. to PBA Defs.' Facts ¶ 24.  Thereafter, plaintiff attended an "informal meeting" with Chief Culick.  PBA Defs.' Facts ¶ 10.  PBA President Pratt brought in a PBA attorney named Rocco DePerno to help plaintiff out.  *Id*. ¶ 9.  But plaintiff claims that attorney DePerno was laboring under an undisclosed conflict of

interest. Pl.'s Resp. to PBA Defs.' Facts ¶ 9. According to plaintiff, he repeatedly sought to limit attorney DePerno's involvement because he believed that attorney DePerno and PBA President Pratt were not acting with plaintiff's best interests in mind. *See, e.g.*, *id*. ¶ 20.

At this meeting, Drake was advised of his rights under the police union contract as well as his rights and obligations under certain recently adopted legal developments. PBA Defs.' Facts ¶¶ 12, 14. Plaintiff was also advised that certain statutes of limitation might not apply if the conduct of which he stood accused rose to the level of a crime. *Id*. ¶ 15.

At this meeting, Chief Culick questioned Drake. Pl.'s Resp. to PBA Defs.' Facts ¶ 13. Thereafter, attorney DePerno spoke with plaintiff. PBA Defs.' Facts ¶ 21. According to plaintiff, attorney DePerno "kept pressuring" plaintiff to sign a Last Chance Agreement to resolve the charges. Pl.'s Resp. to PBA Defs.' Facts ¶ 21.

A second meeting occurred. PBA Defs.' Facts ¶ 25. Drake, Chief Culick, PBA President Pratt, attorney DePerno, and attorney Keach participated in the meeting. *Id*. ¶¶ 25–27. Pl.'s Resp. to PBA Defs.' Facts ¶ 25. At that time, the parties negotiated the terms of the Last Chance Agreement. PBA Defs.' Facts ¶¶ 27–28, 30, 32–34. Plaintiff and attorney Keach reviewed the Last Chance Agreement and signed it. *Id*. ¶¶ 27–28, 30–31. Plaintiff never sought to overturn or challenge the Last Chance Agreement. *Id*. ¶ 36. PBA

President Pratt retired from the department and from the PBA a few years later.  PBA Defs.' Facts ¶ 3.

In Fall of 2020, Drake was served with a Notice of Discipline regarding several on-duty incidents.  PBA Defs.' Facts ¶ 42.  The PBA retained attorney James Tuttle to represent plaintiff.  *Id.* ¶ 45.  The matter went to arbitration, where the parties presented evidence.  *Id.* ¶ 47.  Plaintiff testified on his own behalf, but contends that a dispatcher named Stephanie Gonzales should have been called as a witness.  *Id.* ¶ 47; Pl.'s Resp. to PBA Defs.' Facts ¶ 47.

On April 26, 2021, the Arbitrator found Drake guilty of failing to respond promptly to a call but not guilty of the three other charges that were set out in the 2020 Notice of Discipline.  PBA Defs.' Facts ¶¶ 48–49.  Based on the Last Chance Agreement, the Arbitrator ordered plaintiff's termination from duty.  *Id.* ¶ 50.

## III. <u>LEGAL STANDARD</u>

The entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue of fact is material for purposes of this inquiry if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

In assessing whether there are any genuine disputes of material fact, "a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (citation omitted).  Summary judgment is inappropriate where a "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted).

In making this assessment, "a reviewing court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Ward v. Stewart*, 286 F. Supp. 3d 321, 327 (N.D.N.Y. 2017) (cleaned up).  The court must keep in mind that it is not obligated to grant judgment as a matter of law to one side or the other.  *See id.*

## IV.  <u>DISCUSSION</u>

Drake's third amended complaint alleges that he was hired by the City's police department in early 2009, at a time when the City was in the midst of defending itself against a different discrimination lawsuit.  The City's police department is relatively small and, for almost all of plaintiff's twelve-year tenure, populated entirely by white police officers and white supervisors.

Drake, who is a black man, alleges that he was subjected to racist remarks and instances of disparate racial mistreatment (some of which were called

the "Drake rule" or "Drake rules") that other, similarly situated (but mostly unnamed and undescribed) white police officers did not have to endure.

In 2017, Drake alleges that some of the named defendants subjected him to an improper or unfair disciplinary proceeding without appropriate union representation or due process protections.  As a result of these alleged events, plaintiff was forced to sign a "Last Chance Agreement" that no white officer had ever been "forced" to sign.

Several years later, in December of 2020, Drake and his wife sent an e-mail to the newly elected mayor to alert him to the racial mistreatment that plaintiff had endured, and continued to endure, inside the police department. The newly elected mayor shared this e-mail with his newly promoted chief of police, who allegedly retaliated against plaintiff by seeking his termination using some trumped-up disciplinary charges.  The matter went to a hearing before an arbitrator, where plaintiff was found guilty and terminated.

Plaintiff's twelve-count, third amended complaint asserts claims against the eight named defendants under 42 U.S.C. § 1981 (Counts One, Two, and Three), 42 U.S.C. §§ 1983 and 1985 (Counts Four, Five, and Six), Title VII of the Civil Rights Act of 1964 (Counts Seven, Eight, and Nine), and New York State Human Rights Law (Counts Ten, Eleven, and Twelve).  Dkt. No. 49.

But in order to survive one or both of defendants' motions for summary judgment and get to a trial (let alone to warrant judgment as a matter of law

in his favor), plaintiff must do more than just point to these allegations in his operative pleading. Instead, plaintiff must identify sufficient evidence in the record that, when viewed in his favor, would permit a rational fact-finder to return a verdict for him on one or more of his claims against one or more of the named defendants.

This baseline requirement—the need to identify the record evidence that supports each of his claim or claims—poses a recurring analytical problem in this case. For instance, plaintiff's seventy-one page memorandum of law groups together all of his Title VII and § 1981 (and NYSHRL) claims into a running list of combined grievances. Pl.'s Opp'n, Dkt. No. 95-99 at 27–57.

But as explained in detail below, plaintiff's operative pleading asserts at least three distinct *kinds* of Title VII and § 1981 claims. These distinctions matter: the legal analysis for a disparate treatment claim is different than a hostile work environment claim, and both claims are distinguishable in some important respects from a retaliation claim. Accordingly, rather than try to divine from his briefing how many distinct disparate treatment or retaliation claims plaintiff intended to press, the Court has resorted to relying heavily on the third amended complaint—the operative pleading—as the best available roadmap for identifying plaintiff's individual claims. In consequence, any possible iteration of a claim not explicitly discussed in this opinion has either

been deemed abandoned (as insufficiently developed in the briefing) or been considered and rejected on the merits (without belaboring the discussion).

### A. **Disparate Treatment**

Plaintiff's third amended complaint asserts claims for race discrimination under 42 U.S.C. § 1981 (Count One) and Title VII (Count Seven).  Dkt. No. 49 ¶¶ 200–214, 292–306.  Plaintiff alleges that: (1) the November 6, 2017 Last Chance Agreement and its associated penalties; (2) his union representation in connection with the December 23, 2020 Notice of Discipline; and (3) the associated suspension and eventual termination were "done in whole or in part because of his race."  Dkt. No. 49 ¶¶ 204, 209, 210–211, 299–303.

In other words, plaintiff has alleged "disparate treatment" based on his "race," which is actionable if the defendant had a racially discriminatory intent or motive in taking the adverse job-related action.  *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988).  A racially discriminatory intent or motive can be proven with direct evidence, *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), such as "a workplace policy, practice or decision [that] relies expressly on a protected characteristic," *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015), or "conduct or statements by persons involved in the decision[-]making process that may be viewed as directly reflecting the alleged discriminatory attitude," *Ostrowski v. Atl. Mut. Ins. Co.*, 968 F.2d 171, 182 (2d Cir. 1992).

But direct evidence of an employer's racially discriminatory intent or motivation is usually hard to find. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) (recognizing that employer's intent and state of mind are "usually unstated); *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991 ("An employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent."). Consequently, discrimination cases usually rely on the weight of indirect or circumstantial proof. *Rosen*, 928 F.3d at 533 ("A victim of discrimination is . . . usually constrained to rely on the cumulative weight of circumstantial evidence."); *Sublett v. John Wiley & Sons*, 463 F.3d 731, 736–37 (7th Cir. 2006) (characterizing indirect proof as "more common").

At summary judgment, a plaintiff can establish a "disparate treatment" claim based on indirect evidence: (1) by showing that the employer's stated reason for the challenged job action was actually a "pretext" to cover-up unlawful discrimination; or (2) "by otherwise creating a 'mosaic' of intentional discrimination by identifying 'bits and pieces of evidence' that together give rise to an inference of discrimination.'" *Vega*, 801 F.3d at 87 (quoting *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1988)).

A showing of "pretext" is the most common method for defeating summary judgment. *Bart v. Golub Corp.*, 96 F.4th 566, 575 (2d Cir. 2024) (explaining that "pretext" is useful shorthand for this area of law). To do so, the plaintiff

must satisfy the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 340 (2020) (explaining that this framework is only "a tool for assessing claims" based on indirect proof); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (same).

Under this three-part, burden-shifting framework:

> (1) a plaintiff must first establish a *prima facie* case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reasons for its actions; if the employer does so, the *McDonnell Douglas* framework and its presumptions and burdens disappear, leaving the sole remaining issue of 'discrimination *vel non*;' and thus, (3) the burden shifts back to the plaintiff 'to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'

*Hong Yin v. N. Shore LIJ Health Sys.*, 20 F. Supp. 3d 359, 371 (E.D.N.Y. 2014) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

This basic framework applies to plaintiff's disparate treatment claims under Title VII and § 1981. *See, e.g., Alvarado v. United Hospice, Inc.*, 631 F. Supp. 3d 89, 111 (S.D.N.Y. 2022). But there are several important wrinkles to keep in mind. For instance, Title VII claims are not cognizable against the individual defendants. *See, e.g., Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004). Section 1981, on the other hand, can reach any defendant

who is "personally involved" in the violation. *Id.* at 229. Likewise, although Title VII offers a plaintiff-friendly "motivating factor" causation standard for disparate treatment claims, *see, e.g.*, *Zann Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 845 (2d Cir. 2013), § 1981 claims require a classic showing of "but-for" causation, *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327 (2020).[8] These and other relevant legal distinctions have been noted in greater detail below.

### 1. <u>Prima Facie Case</u>

The *McDonnell Douglas* framework puts the initial burden on the plaintiff to make out a *prima facie* case of discrimination by establishing that: (1) he is a member of a protected class; (2) who is qualified for his position; (3) he suffered an adverse job-related action; and (4) under circumstances that give rise to a minimal inference of discrimination on the basis of one or more of his protected characteristics. *See, e.g.*, *Musante v. Mohawk Vall. Cmty. Coll.*, 270 F. Supp. 3d 564, 577 (N.D.N.Y. 2017). "The plaintiff's burden of proof as to this first step has been characterized as minimal and *de minimis*." *Zann Kwan*, 737 F.3d at 844 (cleaned up).

Upon review, plaintiff has carried his minimal threshold burden. Notably,

---

[8] Courts should be careful not to lean too heavily on this distinction—as the Supreme Court has recently reminded us, there is often more than one "but-for" cause of an adverse action. *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020).

recent Supreme Court precedent has emphasized that an "adverse job action" for a disparate treatment claim need only amount to some kind of difference in treatment that injures the employee. *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024) (rejecting so-called "materiality" requirement in the Title VII context); *Anderson v. Amazon.com, Inc.*, 2024 WL 2801986, at *10 (S.D.N.Y. May 31, 2024) (applying *Muldrow*'s holding to a § 1981 claim).

Further, although plaintiff's briefing makes little or no effort to establish the particularities of how each named defendant was somehow involved in each of the challenged job actions (the 2017 Last Chance Agreement or the 2020 Notice of Discipline and resulting termination), his repeated references to the generally racially charged atmosphere within the department suffice to establish the *minimal* inference of discrimination needed to push the analysis beyond step one of the *McDonnell Douglas* framework.[9]

## 2. **Legitimate, Non-Discriminatory Reason**

Where, as here, the plaintiff establishes his *prima facie* case, "the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions." *Cherry v. N.Y. City. Hous. Auth.*, 564 F. Supp. 3d 140, 165 (E.D.N.Y. 2021). However, "[t]he burden at this stage is also 'light,' and

---

[9]  As noted elsewhere, plaintiff identifies a multitude of other job events—such as being passed over for training opportunities—that might have been actionable as discrete claims consistent with the Supreme Court's holding in *Muldrow*. But plaintiff has not developed these arguments in his briefing (some of which might be time-barred), so the Court has not analyzed them separately.

the defendant need not persuade the court that it was motivated by the reason it provides; rather it must simply articulate an explanation that, if true, would connote lawful behavior." *Sotak v. Bertoni*, 501 F. Supp. 3d 59, 78 (N.D.N.Y. 2020).

Upon review, the City defendants and the PBA defendants have carried their step-two burden of identifying a legitimate, non-discriminatory reason for the challenged job-related actions. As for the City defendants, they have pointed to evidence that an internal investigation into a social media post led to witness statements that supported departmental discipline leading up to the 2017 Last Chance Agreement. City Defs.' Facts ¶¶ 95–98. As for the 2020 Notice of Discipline, plaintiff's own version of the facts acknowledge the *conduct* that underlies the four charges. *Id*. ¶ 142–144, 149. As for the PBA defendants, they have pointed to the "serious allegations of misconduct by numerous women," PBA Defs.' Facts ¶ 6, and to the arbitrator's finding as to one of the charges arising from the 2020 Notice of Discipline, *id*. ¶¶ 48–49.

### 3. **Pretext**

The final step under *McDonnell Douglas* is about pretext. Where, as here, the defendants have produced a legitimate, non-discriminatory reason for the challenged action(s), then "the presumption raised by the prima facie case is rebutted and drops from the case." *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 129 (2d Cir. 2012) (citation omitted). "At the final stage,

the plaintiff has 'the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision'—a burden that 'merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Id*. (cleaned up).

Upon review, even viewed in the light most favorable to him, plaintiff has not identified evidence from which a rational fact-finder could conclude that the investigation that led to the 2017 Last Chance Agreement, the Last Chance Agreement itself, the 2020 Notice of Discipline, or the arbitration proceeding that led to his termination were motivated, either in whole or in any substantial or motivating part, by plaintiff's race. Although plaintiff's recitation of other incidents attributed to other, unnamed officers inside the department might have sufficed to satisfy his *de minimis* burden at step one, under this fact pattern something at least slightly more specific as to one or more of the named defendants is required to create a fact question suitable for a jury on one or more of these disparate treatment claims. [10]

Plaintiff has not offered any basis on which to conclude that one or more of the eight named defendants (to the extent that any of them could properly be held responsible under the governing law) used either disciplinary proceeding

---

[10]  Neither party argues this issue, but the "convincing mosaic" framework does not save these claims for trial, either. *See, e.g.*, *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("To meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised her prima facie case, without more.").

as a pretext to disguise racial animus.[11]  Importantly, in his own set of facts plaintiff concedes that he was accused by several women of misconduct and acknowledges that he signed the Last Chance Agreement.  Although he goes on to claim that these accusations were somehow "time barred" and asserts that the Last Change Agreement was somehow procured by "fraud," these are essentially *ipse dixits*—supported only by plaintiff's conclusory assertions.

The same is true of the 2020 Notice of Discipline that led to the arbitration where plaintiff was terminated.  Even on plaintiff's own version of the facts, he acknowledges the factual basis for the incidents that form the basis of each charge.  Pl.'s Facts ¶ 209, 213–215, 218–219, 226, 228–229,  Although he tries to explain away each event or fault others, plaintiff has not offered any basis on which a fact-finder could conclude that this proceeding was in any way the product of racial animus (by one or more of the named defendants).

In sum, the City defendants and the PBA defendants are each entitled to summary judgment on plaintiff's claims for race discrimination under § 1981 (Count One) and Title VII (Count Seven).  Accordingly, those claims will be dismissed.

---

[11]  Plaintiff acknowledges that he filed his administrative complaint on January 27, 2021.  Pl.'s Resp. to City Defs.' Facts ¶ 2.  Accordingly, a Title VII claim based on the Last Chance Agreement is time-barred by the 300-day limitations period.  Although plaintiff argues otherwise, the so-called "continuing violation" doctrine does not apply to save this claim—the Second Circuit has repeatedly rejected attempts by plaintiffs to use this doctrine to resurrect time-barred disparate treatment claims arising from discrete acts.  The State's pandemic-era executive orders did not toll this period, either.  *See, e.g.*, *Verne v. N.Y. City Dep't of Educ.*, 2022 WL 4626533, at & *6–7 (S.D.N.Y. Sept. 30, 2022).

## B. **Hostile Work Environment**

Plaintiff's third amended complaint asserts claims for a racially hostile work environment under 42 U.S.C. § 1981 (Count Two) and Title VII (Count Eight).  Dkt. No. 49 ¶¶ 215–223, 307–315.  Plaintiff alleges that named and unnamed officers and supervisors created a hostile work environment inside the police department.  In particular, plaintiff alleges that PBA President Pratt "proudly and conspicuously carried a hate symbol as a tattoo" and that other white police officers "stereotyped" him as "not smart," "this is not the hood," "if anything goes wrong it's Drake's fault," told him he was "only hired as a show piece because [he is] Black," and used "many other words to that effect."  Dkt. No. 49 ¶¶ 218–219, 310–311.

A claim for a racially hostile work environment is actionable under Title VII or § 1981 if the plaintiff can show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)); *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320–321 (2015) (applying same basic "severe or pervasive" standard for a § 1981 version of this claim).

"Claims alleging a hostile work environment require a different analysis than discrimination or retaliation claims." *Banks v. General Motors, LLC*, 81

F.4th 242, 259 (2d Cir. 2023).  Unlike discrimination claims based on discrete acts, "incidents that give rise to a hostile work environment 'occur[ ] over a series of days or perhaps years and . . . a single act of harassment may not be actionable on its own.'"  *Id.* (quoting *Morgan*, 536 U.S. at 115).  "The alleged conduct in many hostile work environment cases must be repeated or ongoing before it is adequately severe or pervasive to constitute a violation."  *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015).

To establish a hostile work environment claim, the plaintiff must show that "either a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of [his] working environment."  *Alfano v. Costello*, 294 F.3d 365, 372 (2d Cir. 2002) (citation omitted).  The plaintiff must also show that "the hostile conduct occurred because of a protected characteristic."  *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

"In a claim of a hostile work environment, the emphasis is on the hostility of the work environment as a whole, not the motivation of one decisionmaker, and liability is 'determined only by looking at all the circumstances.'"  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 389 (2d Cir. 2020) (quoting *Harris*, 510 U.S. at 23).  For instance, "[e]vidence of a general work atmosphere . . . –as well as evidence of specific hostility directed toward the plaintiff—is an

important factor in evaluating the claim." *Banks*, 81 F.4th at 262 (quoting *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)).

This is still a "high bar." *Duplan v. City of N.Y.*, 888 F.3d 612, 627 (2d Cir. 2018). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe but are not intended to promote or enforce civility, gentility or even decency. Put differently, excessive criticism and rudeness do not constitute a hostile work environment." *Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 561 (S.D.N.Y. 2022) (cleaned up).

"This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Bentley v. Autozoners, LLC*, 935 F.3d 76, 91 (2d Cir. 2019) (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014).

Upon review, plaintiff has satisfied the *subjective* component of his racially hostile work environment claims. If plaintiff testified consistent with his declaration, he would be able to establish that he subjectively perceived the department to be permeated with racially charged abuse and discrimination that he found to be offensive and distressing. But even viewed in the light most favorable to him, no reasonable fact-finder could hear plaintiff's version of events—at least the non-conclusory versions that he has offered in support

of his motion, relied on to oppose either of defendants' motions, or highlighted in his cross-motion and opposition papers—and conclude that plaintiff has satisfied the *objective* component of this kind of claim.

The objective component of a hostile work environment claim depends on the "totality of the circumstances," which includes: (1) the frequency of the conduct; (2) its severity; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. *Harris*, 510 U.S. at 23. Notably, this "totality of the circumstances" includes events that might be time-barred as discrete claims. *See, e.g.*, *Hampton v. Wilkie*, 554 F. Supp. 3d 512, 521 (E.D.N.Y. 2021) ("Hostile work environment claims fall under the 'continuing violation' exception to the timeliness requirement.").

The problem for plaintiff is that if you strip away the conjecture and excise the legal conclusions, what remains are a series of poorly described episodes or incidents—spread out across most of the length of plaintiff's nearly 12-year tenure—that reference mostly unnamed actors in fairly general terms.

To be sure, plaintiff viewed events as offensive (*e.g.*, the references to the "Drake rules," unnamed officers or employees sometimes calling him "hot chocolate" or a "show piece," or the incident where non-party DiCaprio threatened plaintiff with discipline for wearing certain boots), but these episodes were far from sufficiently severe or pervasive when compared to

existing precedent in this area of law.  *Compare, e.g.*, *Wheeler v. Praxair Surface Techs., Inc.*, 694 F. Supp. 3d 432, 453 (S.D.N.Y. 2023) (applying Title VII standard to reject pre-amendment NYSHRL version of this claim), *with Banks*, 81 F.4th at 265 (summarizing racially offensive workplace setting that included nooses, Confederate flags, racially offensive material, and explicit racial slurs).[12]

In sum, the City defendants and the PBA defendants are both entitled to summary judgment on plaintiff's claims for a hostile work environment under § 1981 (Count Two) and Title VII (Count Eight).  Accordingly, Counts Two and Eight will be dismissed.

**C.  Retaliation**

Plaintiff's third amended complaint asserts claims for retaliation under 42 U.S.C. § 1981 (Count Three) and Title VII (Count Nine).  Dkt. No. 49 ¶¶ 224–233, 316–325.  Plaintiff alleges named and unnamed individuals retaliated against him "at various times" after he "made complaints in good faith to management officials and the Mayors regarding unlawful discrimination in the workplace" by "threatening him, writing him up, forcing him to sign [the

---

[12]  Plaintiff repeatedly asserts, typically in a conclusory fashion, that his work environment was "saturated" with White supremacist symbols.  Pl.'s Opp'n at 29.  Plaintiff does not substantiate this assertion with very much evidence.  But there is at least one fact issue in this record that gives the Court some pause: PBA President Pratt's tattoo.  Absent more, however, the Court declines to send the case to a jury on the strength of this bit of evidence alone.

Last Chance Agreement] . . . , suspending him without pay, and eventually terminating his employment." Dkt. No. 49 ¶¶ 227, 229, 319, 321.

An employer's retaliation in response to an employee's protected activity is actionable if the defendant had a retaliatory intent or motive when taking the adverse action at issue. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). But just like direct evidence of racially discriminatory intent or motive, direct evidence of retaliatory animus is usually hard to find. *See, e.g.*, *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 432 (7th Cir. 2005).

Consequently, retaliation claims tend to rely on the aggregated weight of circumstantial or indirect proof. *See, e.g.*, *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010). This usually involves evidence that a protected activity was followed closely in time by some kind of mistreatment or with a showing that other employees who engaged in substantially similar conduct were treated differently. *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001).

At summary judgment, the sufficiency of a retaliation claim is analyzed with the same framework that applies to intentional discrimination claims based on indirect proof. *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (applying framework to § 1981 claims); *Baptiste*, 680 F. Supp. 3d at 425 (recognizing that § 1981 covers race-based retaliation).

The initial burden is on the plaintiff to establish a *prima facie* case of retaliation by showing: "'(1) participation in a protective activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.'" *Hicks*, 593 F.3d at 164 (quoting *Jute*, 420 F.3d at 173). As before, the burden of proof at this stage is "*de minimis . . .* but it is not non-existent." *Ringel v. N.Y. City Dep't of Educ.*, 616 F. Supp. 3d 205, 233 (E.D.N.Y. 2022) (citation omitted).

"If a plaintiff sustains the initial burden, a presumption of retaliation arises." *Jute*, 420 F.3d at 173. The burden then shifts to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id*. After an employer offers up evidence of a legitimate, permissible reason for its action, "the presumption of retaliation dissipates." *Id*.

At that point, the burden is back on the plaintiff to show that retaliation was a "but-for" cause of the adverse action. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). As noted *supra*, there can be more than one "but-for" cause of an adverse action. *Bostock*, 140 S. Ct. at 1739. Even so, merely showing that retaliatory intent might have been a "substantial" or "motivating" factor is ordinarily not enough. *Zann Kwan*, 737 F.3d at 845.

Upon review, plaintiff has established his *prima facie* case. The "protected activity" about which plaintiff gives at least some level of detail is the June 3,

2020 e-mail about "systemic racism" that plaintiff and his wife sent to newly elected Mayor Cinquanti. There is no doubt that this joint e-mail qualifies as good-faith "protected activity," which is construed broadly under this body of anti-discrimination law. *See, e.g.*, *Ringel*, 616 F. Supp. 3d at 233. Likewise, the parties agree that Mayor Cinquanti shared this e-mail with his newly appointed Chief of Police (Chief Thomas), who thereafter subjected plaintiff to events that also qualify as "adverse action": the 2020 Notice of Discipline that eventually led to plaintiff's termination in early 2021.

However, the City defendants and the PBA defendants are still entitled to summary judgment on plaintiff's retaliation claims. As with his disparate treatment claim based on these events, no rational fact-finder could hear plaintiff's version of the story (at least the one substantiated in his filings and motion papers) and conclude that retaliatory animus motivated any named defendant's conduct.

For instance, although plaintiff asserts in conclusory fashion that two of the incidents in the 2020 Notice of Discipline were "*de minimis*" and had been handled under the prior Chief of Police, plaintiff acknowledges in his own offerings that he engaged in the conduct that forms the basis of each charge.

In sum, the City defendants and the PBA defendants are both entitled to summary judgment on plaintiff's claims for retaliation under § 1981 (Count

Three) and Title VII (Count Nine).  Accordingly, Counts Three and Nine will be dismissed.

**D.  42 U.S.C. §§ 1983 and 1985** (Counts Four, Five, and Six)

Plaintiff's third amended complaint asserts 42 U.S.C. § 1983 claims for equal protection (Count Four), due process (Count Five), and a civil rights conspiracy under §§ 1983 and 1985 (Count Six).[13]

**1.  Equal Protection**

Plaintiff alleges that defendants violated his equal protection rights when they (1) forced him to sign the November 6, 2017 Last Chance Agreement and imposed its associated penalties; (2) provided deficient union representation following the December 23, 2020 Notice of Discipline; and (3) suspended and terminated him in early 2021.  Dkt. No. 49 ¶¶ 239, 242–246.

The Equal Protection Clause is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  "There are a number of common methods for pleading an equal protection claim." *Kisembo v. N.Y. State Office of Children & Family Servs.*, 285 F. Supp. 3d 509, 523 (N.D.N.Y. 2018).

---

[13] The limitations period for § 1983 claims is ordinarily three years. *Harris v. Tioga County*, 663 F. Supp. 3d 212, 234 (N.D.N.Y. 2023).  However, because § 1983 claims "borrow" or reference state law, the State's pandemic-era executive orders tolled the limitations period as to these claims.

First, "[a] plaintiff could point to a law or policy that 'expressly classifies persons on the basis of race.'" *Floyd v. City of N.Y.*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013) (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999)).  Second, "a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *City of Oneonta*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).  Third, "[a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." *Floyd*, 959 F. Supp. 2d at 570 (citation omitted).  Under these three theories, the plaintiff "must prove purposeful discrimination directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (cleaned up); *see also Keles v. Davalos*, 642 F. Supp. 3d 339, 366–67 (E.D.N.Y. 2022).

However, even "[w]here there is no allegation of membership in a protected class, the plaintiff may still prevail on either a 'class of one' or 'selective enforcement' theory." *Brown v. Griffin,* 2019 WL 4688641, at *4 (S.D.N.Y. Sept. 25, 2019).  Pursuant to *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), a plaintiff may assert a "class of one" claim by alleging that "they were intentionally treated different from others similarly situated and that there was no rational basis for this difference in treatment." *Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006).  Alternatively,

pursuant to *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980), a plaintiff may assert a "selective enforcement" claim by showing that they were treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013) (citations omitted)

Upon review, plaintiff's § 1983 equal protection claim fails under this body of law for substantially the same reasons that his discrimination claims were insufficient as a matter of law; *i.e.*, plaintiff acknowledges the accusations against him prompted an internal investigation, admits that he signed the 2017 Last Chance Agreement, and concedes that he engaged in the factual underpinning of the charges for which the department issued its 2020 Notice of Discipline and for which the Arbitrator terminated him.  Further, although plaintiff claims that Lt. Hennessy "engaged in substantially worse repeated misconducts [*sic*]" and was not treated "anywhere as harshly" as he was, a review of the settlement document entered into by Lt. Hennessy reveals that it is similar to the Last Chance Agreement signed by plaintiff (the principal difference being a one-year probationary period).  Dkt. No. 86-14

In sum, the City defendants and the PBA defendants are both entitled to summary judgment on plaintiff's § 1983 claim for equal protection (Count Four).  Accordingly, Count Four will be dismissed.

## 2. **Due Process**

Plaintiff alleges that defendants violated his due process rights when they (1) forced him to sign the November 6, 2017 Last Chance Agreement and imposed its associated penalties; (2) provided deficient union representation following the December 23, 2020 Notice of Discipline; and (3) suspended and terminated him in early 2021.  Dkt. No. 49 ¶¶ 263–264, 270–271.

The Due Process Clause protects procedural and substantive rights.  *Page v. Cuomo*, 478 F. Supp. 3d 355, 370 (N.D.N.Y. 2020).  Procedural due process requires that "a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

"To assert a violation of procedural due process rights, a plaintiff must first identify a property right, second show that the state has deprive him of that right, and third show that the deprivation was effected without due process." *Ferreira v. Town of E. Hampton*, 56 F. Supp. 3d 211, 225 (E.D.N.Y. 2014) (citation omitted).  "Notice and an opportunity to be heard are the hallmarks of due process." *Id.*

The Second Circuit has held that a plaintiff cannot establish a due process violation where "pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures provided for in a collective bargaining agreement." *Adams v. Suozzi*, 517 F.3d 124, 128 (2d

Cir. 2008).  As relevant here, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objection . . . [and] afford a reasonable time for those interested to make their appearance."  *Castanza v. Town of Brookhaven*, 700 F. Supp. 2d 277, 290 (E.D.N.Y. 2010).

Upon review, plaintiff's § 1983 due process claim fails under this body of law.  Although plaintiff accuses named and unnamed defendants of engaging in irregular or unfair behavior vis-à-vis the particularities of the collective bargaining process, he acknowledges that he received oral notice that he was under investigation for serious misconduct, retained his own attorney after deciding he was unhappy with the attorney offered by the PBA, and signed the 2017 Last Chance Agreement instead of proceeding to a further hearing under the collective bargaining agreement.  Likewise, plaintiff concedes that he engaged in the factual conduct underlying the 2020 Notice of Discipline and admits that the Arbitrator found him guilty of charge three.

In sum, the City defendants and the PBA defendants are both entitled to summary judgment on plaintiff's § 1983 claim for a violation of his right to due process (Count Five).  Accordingly, Count Five will be dismissed.

### 3. **Conspiracy**

Plaintiff alleges that defendants engaged in a conspiracy to deprive him of his civil rights when they (1) forced him to sign the November 6, 2017 Last

Chance Agreement and imposed the associated penalties; (2) provided him with deficient union representation for the December 23, 2020 Notice of Discipline; and (3) suspended and terminated him in 2021.  Dkt. No. 49 ¶¶ 282–284.

Upon review, any § 1983 or § 1985 claim for conspiracy based on these or other events must be dismissed because plaintiff has failed to show that he has any actionable federal claims.  *DeMartino v. N.Y. State Dep't of Labor*, 167 F. Supp. 3d 342, 373 (E.D.N.Y. 2016) (§ 1983); *Thomas v. Genova*, 698 F. Supp. 3d 493, 522 (E.D.N.Y. 2023) (§ 1985).  Accordingly, Count Six will be dismissed.

### E.  New York State Human Rights Law

Plaintiff's third amended complaint asserts claims under the NYSHRL for race discrimination (Count Ten), a racially hostile work environment (Count Eleven), and retaliation (Count Twelve).  Dkt. No. 49 ¶¶ 326–343, 344–355, 356–368.

Historically, courts analyzed these state-law race discrimination claims in tandem with Title VII and § 1981.  *Alvarado*, 631 F. Supp. 3d at 114–15.  But effective October 11, 2019, the State of New York amended the NYSHRL to broaden its reach.  *Wheeler*, 694 F. Supp. 3d at 451.  "The case law, however, has yet to definitely resolve whether the NYSHRL's liability standard is now

coextensive with that of [New York City's Human Rights Law], or whether it requires more, so as to impose a standard between federal and city law." *Id*.

Plaintiff may well have one or more triable NYSHRL claims under the amended version of this body of law.  Indeed, a post-amendment hostile work environment claim under the NYSHRL appears to benefit from a particularly plaintiff-friendly standard.  However, because these state-law claims appear likely to raise novel or complex issues of state law, and because the court has already dismissed plaintiff's federal claims, supplemental jurisdiction over these remaining state-law claims will be declined.  *See* 28 U.S.C. § 1367(c)(1) and (3).  Accordingly, plaintiff's NYSHRL claims (Counts Ten, Eleven, and Twelve) will be denied without prejudice to renewal in an appropriate state-court proceeding.[14]

## V. **CONCLUSION**

Summary judgment is a challenging tool to wield properly.  On one hand, the court must be cautious not to deny the non-movant (usually the plaintiff) an opportunity to present his viable claims to a jury.  On the other, the court must also be careful not to waste a jury's time by setting a case down for trial when it is legally insufficient and should have been dismissed.

---

[14]  Under C.P.L.R. 205(a) and 28 U.S.C. § 1367(d), a plaintiff has at least thirty days in which to re-file a claim in state court that was timely filed in federal court.

That balance is more difficult to strike when, as here, the parties offer up voluminous-and-disorderly briefing that fails to stay focused on the subset of disputes that are both material *and* genuine. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("While genuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, materiality runs to whether the dispute matters; i.e., whether it concerns facts that can affect the outcome under the applicable substantive law.").

Defendants are entitled to summary judgment on plaintiff's federal-law claims. But plaintiff's state-law claims will be dismissed without prejudice to renew in a state forum, where recent amendments to the NYSHRL might be more favorable to plaintiff's hostile work environment (or other) claims.

Therefore, it is

ORDERED that

1. The PBA defendants' motion for summary judgment (Dkt. No. 86) is GRANTED in part and DENIED in part;

2. The City defendants' motion for summary judgment (Dkt. No. 87) is GRANTED in part and DENIED in part;

3. Plaintiff's motion for summary judgment (Dkt. No. 95) is DENIED;

4. Plaintiff's federal-law claims under § 1981 (Counts One, Two, and Three), §§ 1983 and 1985 (Counts Four, Five, and Six), and Title VII (Counts Seven, Eight, and Nine) are DISMISSED;

5.  The Court DECLINES to exercise supplemental jurisdiction over plaintiff's state-law claims; and

6.  Plaintiff's state-law claims under the NYSHRL (Counts Ten, Eleven, and Twelve) are DISMISSED without prejudice to re-filing in state court.

The Clerk of the Court is directed to terminate the pending motions, enter a judgment accordingly, and close the file.

IT IS SO ORDERED.

David N. Hurd
U.S. District Judge

Dated:  August 28, 2024
        Utica, New York.